Ernest REYNOLDS, III, Appellant,

v.

**Michael MURPHY a/k/a and f/k/a John Michael Murphy and Phillips Investment Resources, L.L.C., Appellees.**

No. 2–03–294–CV.

Court of Appeals of Texas, Fort Worth.

Feb. 9, 2006.

---

Fielding, Parker & Beck, L.L.P., David Fielding, Nathan B. Schattman, Taylor, Olson, Adkins, Sralla & Elam, L.L.P., Tim G. Sralla, Fort Worth, for appellant.

Haynes and Boone, L.L.P., David H. Harper and Debra J. McComas, Dallas, for appellees.

PANEL B: LIVINGSTON, GARDNER, and MCCOY, JJ.

## OPINION ON REHEARING

TERRIE LIVINGSTON, Justice.

After reconsidering our prior opinion on appellant Ernest Reynolds III's motion for rehearing and request for rehearing en banc, we deny the motion and request for rehearing en banc, but we withdraw our July 14, 2005 opinion and judgment and substitute the following in their place in order to clarify and correct parts of our original opinion.[1]

### Introduction

■ This case of first impression involves the potential liability of an author and publisher of an investment-related

---

1. We also grant appellant's agreed motion to extend the length of the motion for rehearing and rehearing en banc. In addition to these motions, appellant filed a motion to supplement the record, attempting to supplement the clerk's record with letters showing that he did request a hearing on his motion to compel and on appellees' motion for protective order. We have considerable discretion in determining whether to file this record. *See, e.g., Worthy v. Collagen Corp.,* 967 S.W.2d 360, 365–66 (Tex.), *cert. denied,* 524 U.S. 954, 118 S.Ct. 2372, 141 L.Ed.2d 740 (1998). Not all of the documents that appellant asked the trial court clerk to file are in the clerk's record, and the letters that are in the record—which discuss setting a hearing on appellant's motion to compel and appellees' motion for protective order—do not change our ultimate conclusion in this opinion: that the admissions were never deemed in the first place. *See* discussion *infra* pp. 259–60. Thus, we deny appellant's motion to supplement the clerk's record. We also deny appellant's request for oral argument. *See* Tex.R.App. P. 39.8, 49.3.

newsletter to a subscriber who alleges that he incurred losses as a result of making investments in accordance with recommendations in the newsletter. Appellant Ernest Reynolds, III appeals from a summary judgment granted in favor of appellees Michael Murphy a/k/a and f/k/a John Michael Murphy and Phillips Investment Resources, L.L.C. Reynolds challenges the summary judgment in nine issues, complaining specifically that (1) the United States Supreme Court holding in *Lowe v. Securities and Exchange Commission*,[2] protecting publishers from prior restraint of free speech by federal agencies, does not extend to abolish all private causes of action for the consequences of a misuse of speech, (2) the limited First Amendment protection of *Lowe* should not be extended to shield publishers and nonpublisher authors of harmful speech from liability for their actions, (3) the no-evidence motion for summary judgment was premature, (4) the trial court abused its discretion by denying Reynolds's motion for continuance because the discovery deadline had not passed and appellees refused to adequately respond to discovery, (5) Reynolds presented sufficient evidence on each of his causes of action to defeat appellees' no-evidence motion for summary judgment, (6) Reynolds established genuine questions of material fact as to each challenged ele-

ment of his various causes of action,[3] (7) the trial court erred by considering appellees' objections to Reynolds's evidence filed for the first time on the date of the motion for summary judgment hearing, (8) the trial court erred by its evidentiary rulings, and (9) the trial court erred by denying Reynolds's motion to reform the order. We affirm in part and reverse and remand in part.

### Background

■ In 1999, Reynolds received an advertisement for *Technology Investing*, a newsletter published by Phillips and authored by Murphy. Reynolds ordered a subscription by phone and began receiving the newsletter as well as supplemental faxes and email bulletins. In his pleadings, Reynolds alleges that he relied on the newsletter for "research and information in making investment decisions" and that he attempted to follow the advice given in the newsletter.[4] Reynolds also alleges in his pleadings that in 2001 he became concerned about the advice he was receiving in the newsletter. Specifically, he was not seeing the returns on his investments that the newsletter described. Eventually, he sold those stocks at a loss despite Murphy's recommendation to hold the stock as a long-term investment.[5]

---

2. 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985).

3. Appellees contend Reynolds waived his challenge to the summary judgment because he failed to address each ground appellees asserted in their motion. But Reynolds has presented a general issue on appeal with respect to the propriety of the summary judgment; thus, he has not waived his challenge to the propriety of the summary judgment in appellees' favor. *See* Tex.R.App. P. 38.9; *Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex.1970); *see also Plexchem Int'l, Inc. v. Harris Appraisal Dist.*, 922 S.W.2d 930, 930 (Tex.1996).

4. Reynolds does not specify any particular advice that he followed or stocks he purchased or sold in reliance on the advice in the newsletter, other than to allege that instead of selling Microsoft stock when its price fell, he "held" it in accordance with Murphy's advice. But Reynolds does admit that he eventually sold his Microsoft stock at a loss against Murphy's advice.

5. Although this appears to be an admission that the cause of Reynolds's losses was his own failure to follow the advice in the newsletter, it is not dispositive of all of Reynolds's claims because appellees did not allege this admission as a ground for summary judgment

Reynolds sued appellees for breach of contract, negligence, negligent misrepresentation, fraud and misrepresentation, and violations of the Texas Deceptive Trade Practices Act[6] (DTPA). Appellees filed no-evidence and traditional motions for summary judgment. The trial court granted summary judgment for appellees without stating the grounds upon which the judgment was based.

## Procedural Issues

Reynolds appeals several procedural matters, some of which we must address before turning to the substance of the summary judgment issues. Appellees filed both a no-evidence and a traditional motion for summary judgment. Several of Reynolds's complaints relate to the discovery process; Reynolds contends generally that appellees stonewalled him during discovery and that he did not have enough time to complete discovery and obtain evidence to defeat the no-evidence motion,

through no fault of his own.[7] Although when both no-evidence and traditional summary judgment motions are filed we usually address the no-evidence motion first, see *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex.2004), here we will review the propriety of granting the traditional summary judgment first because it is dispositive of the majority of Reynolds's claims.[8] Therefore, we need not address Reynolds's third through fifth, and the part of Reynolds's ninth, issues pertaining to discovery matters. *See* TEX.R.APP. P. 47.1; *Tex. Mut. Ins. Co. v. Surety Bank, N.A.*, 156 S.W.3d 125, 131 n. 4 (Tex.App.-Fort Worth 2005, no pet.).

The remainder of Reynolds's ninth issue relates to whether the trial court should have granted Reynolds's motion to reform the judgment to specify the grounds upon which it granted summary judgment. We find no authority, nor does Reynolds cite any, requiring a trial court to specify the grounds upon which it

---

on all of Reynolds's claims. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 204 (Tex.2002); *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 912 (Tex.1997).

6. *See* TEX. BUS. & COM.CODE ANN. § 17.46(b)(5), (7), (8), (12), (24) (Vernon Supp.2004–05).

7. Although we do not condone gamesmanship in the discovery process, we do not address those issues in this case because other issues are dispositive.

8. Although two of Reynolds's complaints on appeal are that (1) the trial court improperly granted summary judgment before the deadline for completing discovery in the case and (2) the trial court abused its discretion by denying his first motion for continuance based on the same grounds, both of these complaints pertain to the propriety of the no-evidence motion for summary judgment only. Because our disposition of the appeal relates only to Reynolds's complaints about the traditional summary judgment motion, we need not address his contentions about these two complaints.

However, in light of Reynolds's motion for rehearing, we note the following: (1) a traditional summary judgment is not subject to the same restrictions as a no-evidence summary judgment, which may not be granted until an adequate time for discovery has passed, *see* TEX.R. CIV. P. 166a(a) ("A party ... may, at any time after the adverse party has appeared or answered, move ... for a summary judgment ...."), 166a(i); *Clemons v. Citizens Med. Ctr.*, 54 S.W.3d 463, 466 (Tex.App.-Corpus Christi 2001, no pet.). *But cf. Nelson v. PNC Mortgage Corp.*, 139 S.W.3d 442, 446 (Tex.App.-Dallas 2004, no pet.) (holding, in extreme, fact-specific case, that traditional summary judgment was improper when discovery motions were outstanding when trial court ignored all motions filed by pro se inmate, yet promptly set and responded to all motions filed by civil defendants); and (2) the supreme court has recently reiterated that a first continuance is not mandatory simply because it is uncontroverted and in proper form. *See Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 292 n. 142 (Tex.2004).

grants summary judgment. *Cf. Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003) (citing long-standing rule that trial court order granting summary judgment without specifying grounds must be affirmed if any theories presented to trial court and preserved for appellate review are meritorious). Thus, we overrule the remainder of Reynolds's ninth issue and turn to his evidentiary and discovery issues.

■ Reynolds's seventh and eighth issues complain about the trial court's rulings on the parties' summary judgment evidence. The trial court denied Reynolds's objections to appellees' evidence and granted appellees' objections to Reynolds's evidence. A trial court's rulings admitting or excluding evidence are reviewable under an abuse of discretion standard. *Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998).

■ In his seventh issue, Reynolds claims that the trial court erred by considering appellees' objections to his responsive summary judgment evidence because their objections were untimely filed. Appellees did not file their objections to Reynolds's evidence until the day of the summary judgment hearing. Generally, the nonmovant must file its response or reply (including any objections to the movant's evidence) "not later than seven days prior to the day of [the] hearing." TEX.R. CIV. P. 166a(c). A movant's exceptions to the nonmovant's response or reply should be filed at least three days before the

hearing. TEX.R. CIV. P. 21, 91; *McConnell v. Southside ISD,* 858 S.W.2d 337, 343 n. 7 (Tex.1993).[9] But a movant's objections to the competency of a nonmovant's evidence that are filed the day of the hearing are not untimely and may be considered and ruled upon by the trial court. *Shelton,* 144 S.W.3d at 119. Thus, we overrule Reynolds's seventh issue.

■ In his eighth issue, Reynolds contends that the trial court erred by granting appellees' objections to his summary judgment evidence and by denying his objections to some of appellees' evidence. As an initial matter, we need not determine if the trial court abused its discretion by denying Reynolds's objections to appellees' summary judgment evidence because, as we explain below, even disregarding that evidence, Reynolds did not raise a fact issue on appellees' summary judgment grounds. *See* TEX.R.APP. P. 47.1. As to appellees' objections to Reynolds's evidence, which the trial court granted in its order granting summary judgment, Reynolds presented the following items as summary judgment evidence: his affidavit, a set of requests for admissions that he claimed were deemed, an excerpt from a publication entitled *Overpriced Stock Service,* and a copy of an article purporting to be from TheStreet.com. Appellees timely objected to the purported deemed admissions, claiming that they were not deemed because appellees timely filed a motion for protective order with respect to the requests within the thirty-day period set forth in the rules. *See* TEX.R. CIV. P. 192.4, 192.6, 198.2; *In re Edge Capital Group, Inc.,* 161 S.W.3d 764, 766–67 (Tex.App.-Beaumont 2005, orig. proceeding) (noting

---

**9.** A movant's exceptions to a nonmovant's response or reply complain that the issues identified in the nonmovant's response as defeating summary judgment are unclear or ambiguous. *See McConnell,* 858 S.W.2d at 343; *Shelton v. Sargent,* 144 S.W.3d 113, 119 (Tex.App.-Fort Worth 2004, pets. denied).

that trial court has discretion to narrow scope of discovery to protect party's legitimate interests, but also acknowledging rule 192.6's admonishment that a motion for protective order should not be filed when an objection or assertion of privilege is appropriate). Reynolds claims that the motion for protective order did not prevent the requests from being deemed admitted because the trial court never ruled on the motion. Thus, Reynolds contends that appellees' supplemental response was their first one, that it was untimely, and that the admissions were deemed admitted. We disagree.

A "party must state specifically the legal or factual basis for [its] objection [to propounded discovery] and the extent to which the party is refusing to comply with the request." TEX.R. CIV. P. 193.2(a). An objection that is not made within the time required by the discovery rules or by court order, or that is obscured by numerous unfounded objections, is waived unless the court excuses the waiver for good cause shown. TEX.R. CIV. P. 193.1, 193.2(e). A party from whom discovery is sought may also, within the time for a response, move for a protective order. TEX.R. CIV. P. 192.6(a). A party should not move for protection when an objection is appropriate, but a motion for protective order does not waive any objections. *Id.* A trial court may grant a protective order to protect a party from "undue burden, unnecessary expense, [or] harassment." TEX.R. CIV. P. 192.6(b).

Appellees claimed in their motion for protective order that the 996 requests for admissions—Reynolds's third set—were unduly burdensome and harassing.[10] In addition to their general contention, appellees objected to some of the admissions on specific grounds. After the thirty-day period expired, appellees filed what they called a supplemental response, answering some of the admissions and objecting to others. The trial court never ruled on the motion for protective order.

Appellees' summary judgment evidence shows that in addition to the motion for protective order, which was filed on May 20, 2003, appellees also attached to the motion answers to the requests that asserted appellees' general objections—that the volume of the requests was unduly burdensome and harassing—and also contained more specific objections to certain, but not all, of the requests. Reynolds contends that the general objections were not sufficient to constitute a complete response. *See* TEX.R. CIV. P. 193.1. But when a party has objected to a large set of requests for admissions on the ground that the volume of the requests is unduly burdensome and harassing, requiring that party to file a more specific objection to each request to prevent the admissions from being deemed would defeat the purpose of filing such a general objection, a motion for protective order, or both, which are expressly authorized by the rules. *See* TEX.R. CIV. P. 192.6(b), 193.2(b); *cf. Grass v. Golden*, 153 S.W.3d 659, 662 (Tex.App.-Tyler 2004, orig. proceeding) (noting that under rule 192.6(a), party seeking protection from time and place of discovery must state a *reasonable* time and place for discovery with which it will comply). Moreover, Reynolds cites no authority in his brief directing us to hold otherwise. *See, e.g., Shelton*, 144 S.W.3d at 119 (waiving point on appeal for failure to cite authori-

10. Reynolds served the same set of 498 requests on each appellee for a total of 996 requests. He had already served a first set on Murphy containing 15 requests and a first set on Phillips containing 94 requests, a total of 109 first requests. He then served a second set containing 207 requests on each appellee, for a total of 414 requests in the second set. In all, Reynolds served 1,519 requests for admissions on appellee.

ty). He does not cite any authority, nor have we found any, holding that the filing of a motion for protective order within the time period for answering requests for admissions is not sufficient to prevent those admissions from being deemed admitted if the court does not eventually rule on the motion. *See id.* We hold that appellees' motion for protective order, along with their attached general objections to the requests for admissions on the ground that they were unduly burdensome and harassing, was adequate and prevented the admissions from being deemed under rule 198. TEX.R. CIV. P. 198. Thus, contrary to Reynolds's assertions, there was no need for a trial court order "undeeming" the admissions because they were never deemed admitted in the first place. We conclude that the trial court did not abuse its discretion by concluding that the requests were not deemed admitted and by granting appellees' objections to the "deemed" requests for admissions attached to Reynolds's response.

 Reynolds also complains about the trial court's granting appellees' objections to his affidavit. Appellees objected to nearly every sentence in the affidavit. But we need not address each objection. Considering the affidavit in the light most favorable to Reynolds, as we must, and ignoring all conclusory statements in the affidavit, which are not proper summary judgment evidence,[11] we glean the following from his affidavit:

- Appellees routinely and repeatedly used the United States mail and interstate telephone lines to solicit, contact, and deliver information to Reynolds;
- Reynolds paid appellees many hundreds of dollars, which appellees collected in payment more than once;

- Appellees made representations to and contracted with Reynolds with respect to the newsletter, and it appears appellees sold the same thing to many others in Texas, the United States, and outside the United States;
- Reynolds believed and trusted appellees and came to believe the *Technology Investing* newsletter was reliable and read it regularly. He also regularly called the hotline for Murphy's advice and received and read many of the flash bulletins. He got a lot of information and advice from appellees who advertised and promoted Murphy;
- Appellees represented that Murphy had special experience, knowledge, skill, and special contacts and had developed a new, but successful and tested method for selecting the best and most profitable investments, that he could "safely lead . . . subscribers down the path to build . . . big profits over time";
- Murphy was represented as a person who managed successful investment funds for individuals and managed mutual funds;
- Appellees tried to tell the court that a book and articles about Murphy told of some of the more sordid and revealing true facts about Murphy, but appellees did not previously provide that book and those articles to Reynolds. Reynolds knew nothing of these facts until April 30, 2002;
- Reynolds initially began paying for his subscription in November 1999 and renewed his subscription until around November 2001;
- Murphy said another analyst "might be headed for 'hell' because of [that

---

11. *See Seaway Prods. Pipeline Co. v. Hanley,* 153 S.W.3d 643, 653–54 (Tex.App.-Fort Worth 2004, no pet.).

analyst's] short comings as an analyst," and Murphy made frequent references to his "wall of shame" for analysts whom he claimed he had outperformed;

- Appellees purported to sell advice and expertise to Reynolds, and Reynolds paid appellees for that advice and expertise;
- Part of the subscription fee pays for the newsletter. Reynolds also received fax updates to the newsletter and access to telephone hotlines;
- Appellees promoted Murphy aggressively as a stock guru referring to him as legendary for his alleged skill in finding and selecting investments;
- Murphy eventually made statements on the hotline and in the publication admitting directly or indirectly that his earlier strategy and recommendations were fundamentally wrong; and
- Reynolds would not have subscribed to the newsletter had he been informed of Murphy's criminal history, past drug use, and poor performance as a fund manager.[12]

As explained below, none of this evidence creates a fact issue on any of appellees' grounds for summary judgment. Thus, we overrule Reynolds's eighth issue to the extent that the affidavit contains conclusory statements. But we need not determine whether the remainder of the issue should be sustained because even considering the remaining evidence that the trial court agreed was objectionable, the affidavit does not create a fact issue on Reynolds's claims. Having dispensed with Reynolds's issues related to procedural matters, we now turn to his substantive issues involving the propriety of granting the traditional motion for summary judgment.

## Standard of Review

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Sw. Elec. Power Co.,* 73 S.W.3d at 215.

When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex.1965).

The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action or defense as a matter of law. *Clear Creek Basin,* 589 S.W.2d at 678.

If the uncontroverted evidence is from an interested witness, it does nothing more than raise a fact issue unless it is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted. Tex.R. Civ. P. 166a(c); *Trico*

---

**12.** Other evidence appellees objected to but that we consider in our holding is detailed later in this opinion.

*Techs. Corp. v. Montiel,* 949 S.W.2d 308, 310 (Tex.1997).

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995).

### First Amendment Protection– Negligence and Negligent Misrepresentation

In his first and second issues, Reynolds contends that a First Amendment case relied on by appellees, *Lowe,* does not provide authority for summary judgment on all of his claims against appellees. 472 U.S. at 181, 105 S.Ct. at 2557.[13] He contends that *Lowe* does not address the specific issues in this case and that it cannot be used to shield a publisher and author for wrongful speech. Thus, we begin with an analysis of the *Lowe* case.

The issue in *Lowe* was whether the Securities and Exchange Commission (SEC) could obtain a permanent injunction under the federal Investment Advisers Act (IAA) prohibiting the publication of securities newsletters containing "nonpersonalized investment advice and commentary." *Id.* at 183, 105 S.Ct. at 2559. The Court described the publications at issue in that case as follows:

A typical issue of the Lowe Investment and Financial Letter contained general commentary about the securities and bullion markets, reviews of market indicators and investment strategies, and specific recommendations for buying, selling, or holding stocks and bullion. The newsletter advertised a "telephone hotline" over which subscribers could call to get current information. The number of subscribers to the newsletter ranged from 3,000 to 19,000. It was advertised as a semimonthly publication, but only eight issues were published in ... 15 months....

. . . .

The Lowe Stock Advisory had only 278 paid subscribers and had published only four issues between May 1981 and its last issue in March 1982. It also analyzed and commented on the securities and bullion markets, but specialized in lower-priced stocks. Subscribers were advised that they could receive periodic letters with updated recommendations about specific securities and also could make use of the telephone hotline.

*Id.* at 185 & n. 7, 105 S.Ct. at 2560 & n. 7. The Supreme Court held that the newsletter was a bona fide publication of general circulation. Thus, it was not an "investment adviser" subject to federal regulation under the IAA, and the government could not impose a prior restraint on its publication. *Id.* at 211, 105 S.Ct. at 2573.

 We agree that *Lowe* is not directly on point. This case does not involve an attempt by a governmental entity to restrain speech under the IAA. It concerns a private litigant's attempt to impose liability on a publisher and author. In addition, the First Amendment does not protect fraudulent or deceptive speech, *see, e.g., Illinois v. Telemarketing Assocs.,*

---

13. Reynolds contends that a summary judgment based on this ground would be improper because it was raised for the first time on appeal. But appellees raised this as a general ground as to all of Reynolds's claims in their motion for summary judgment.

538 U.S. 600, 612, 123 S.Ct. 1829, 1836, 155 L.Ed.2d 793 (2003), nor does it give one the right to breach a contract or make false warranties. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 420, 112 S.Ct. 2538, 2563, 120 L.Ed.2d 305 (1992) (Stevens, J., concurring). Thus, summary judgment would not have been proper on First Amendment grounds as to Reynolds's breach of contract, fraud and misrepresentation, and DTPA claims. We have found no Texas authority construing *Lowe,* nor have we found any Texas case in which a subscriber to or reader of a publication sued the publication and its author based on nondefamatory, negligently untruthful or misleading content contained within the publication. But since *Lowe* was decided, two cases in other jurisdictions have explored whether publishers[14] of similar newsletters could be liable to private litigants for negligent investment "advice" given in a similar format. Those cases held that publishers of subscription newsletters similar to the one at issue here could not be held liable for negligence and negligent misrepresentation. *See Ginsburg,* 915 F.Supp. at 739–40; *Daniel v. Dow Jones & Co.,* 137 Misc.2d 94, 520 N.Y.S.2d 334, 336–40 (N.Y.Civ.Ct.1987).[15]

The court in *Ginsburg* granted the motion to dismiss of the defendants, the author and publisher of an investment newsletter. 915 F.Supp. at 734, 740. The plaintiff had sued the defendants because he relied on investment advice contained in the newsletter that turned out to be based on inaccurate assumptions, which the author later admitted in the newsletter. *Id.* at 734. In determining that Ginsburg's claims for negligence and negligent misrepresentation should be dismissed, the court noted that "[t]he publication is offered to the general public and the information provided in the publication is of a general nature, that is, it is not specifically tailored to [the] financial situation of any individual subscriber." *Id.* at 739. The court held that the newsletter, which was similar to the newsletter at issue here, was "subject to the same protection under the First Amendment as any other publication." *Id.* Based on First Amendment concerns and concerns of unlimited liability because of the scope of publication of such newsletters,[16] the court held that Ginsburg's negligent misrepresentation claims should be dismissed. *Id.* at 738–40.

In *Daniel,* the plaintiff subscribed to an online news service accessible via access codes and passwords. 520 N.Y.S.2d at 335. The plaintiff claimed that the service negligently published a news story that was false and misleading because it omitted a material fact. *Id.* The court granted the defendant's motion to dismiss the cause of action, holding that the relationship of the parties was "functionally identical to that of a purchaser of a news-

---

**14.** The *Ginsburg* case also addressed the potential liability of the author of such a newsletter, holding that the author could not be held liable for negligence and negligent misrepresentation on First Amendment grounds. *Ginsburg v. Agora, Inc.,* 915 F.Supp. 733, 733–40 (D.Md.1995).

**15.** *But see In re Factor VIII or IX Concentrate Blood Prods. Litig.,* 25 F.Supp.2d 837, 845 & n. 10, 845–46 (noting that *Ginsburg* and *Daniel* "indicate a way of balancing First Amendment values with the value of providing financial redress for *financial* losses,"

but distinguishing those cases in determining that First Amendment did not shield defendant in that case because need for financial redress for "grave" nature of injuries alleged-exposure to and infection with HIV-outweighed potential chilling effect on dissemination of information (emphasis added)).

**16.** The court relied on the holding in the *Daniel* case as well as *Gutter v. Dow Jones, Inc.,* 22 Ohio St.3d 286, 490 N.E.2d 898 (1986).

paper"[17] and consequently there was no special relationship between the parties upon which to impose liability for negligent misrepresentation.[18] *Id.* at 336–38. The court also held that the news service was entitled to the same First Amendment protection as newspapers, which precludes liability for nondefamatory, negligently untruthful news. *Id.* at 339.

■ We agree with the analysis and holdings of these cases with respect to the First Amendment issue.[19] We conclude that if the summary judgment evidence shows that appellees authored and published an investment newsletter of general circulation, similar to those at issue in *Lowe* and *Ginsburg*, then appellees are entitled to First Amendment protection from Reynolds's negligence and negligent misrepresentation claims.

Appellees' summary judgment evidence includes affidavits from Murphy and David Bishop, Senior Vice President of Phillips. In his affidavit, Bishop avers that

6. Beginning in January 1999 and continuing each month since then through the present time, the [*Technology In-*

17. The court stated, "News services, whether free to the public, as are television or radio, or more expensive specialized media, such as defendant's computerized database, are instruments for the free flow of all forms of information, and should be treated as unquestionably within the First Amendment's guarantee of freedom of the press," and "[T]he cost of the service and the degree of its distribution are not related to the importance of the protection needed for the statement at issue." *Id.* at 339–40. Thus, the focus of the First Amendment inquiry should be on the specificity of the advice to any given subscriber as opposed to the free cost or availability of the publication. The factors cited by the concurring opinion reflect the publisher's greater interest in maintaining a value in, and the proprietary nature of, the information contained in the newsletter rather than providing specifically tailored advice to a particular subscriber. *See* Concurring Op. on Reh'g at 275–76.

18. The court held that the plaintiff and defendant did not have the type of special relationship contemplated by section 552 of the Restatement (Second) of Torts. We do not address the applicability of section 552 in this case because appellees did not move for summary judgment on that ground; their motion for summary judgment alleged only the First Amendment grounds. Thus, we also need not address the section 552 arguments in Reynolds's motion for rehearing.

19. Reynolds contends that the newsletter contains commercial speech, which does not enjoy the same level of First Amendment protec-

tion as noncommercial speech. *See, e.g., Dun & Bradstreet v. Greenmoss Builders, Inc.,* 472 U.S. 749, 759, 105 S.Ct. 2939, 2945, 86 L.Ed.2d 593 (1985); *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978). He claims that whether the newsletter meets the *Lowe* definition of a publication of general circulation is irrelevant because the holding in *Lowe* is based solely on the Court's construction of the IAA, rather than First Amendment grounds. But although the Supreme Court in *Lowe* did not "specifically address the constitutional question," it did conclude as follows: "To the extent that the chart service contains factual information about past transactions and market trends, and the newsletters contain commentary on general market conditions, *there can be no doubt about the protected character of the communications ....*" *Lowe,* 472 U.S. at 210, 105 S.Ct. at 2573 (footnote omitted) (emphasis added). This statement is followed by a footnote, which states, "Moreover, because we have squarely held that the expression of opinion about a commercial product such as a loudspeaker is protected by the First Amendment, it is difficult to see why the expression of an opinion about a marketable security should not also be protected." *Id.* at 210 n. 58, 105 S.Ct. at 2573 n. 58 (citations omitted). Thus, we believe that our conclusion is not precluded by the Court's holding in *Lowe. See Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n,* 149 F.3d 679, 686 (7th Cir.1998) (holding that publication containing impersonal advice and information about the performance or value of particular commodities does not constitute commercial speech).

*vesting* ] Newsletter was prepared by Murphy and his staff and provided to Phillips which, in turn, published it and sent copies to Newsletter subscribers every month.

7. Murphy also prepared supplements to the monthly Newsletter for distribution by Phillips called Flash Bulletins and hotline updates.

8. The Newsletter is available to the public and can be obtained for an annual subscription price.

. . . .

10. Subscriptions to the newsletter were advertised in a free report (the "Free Report"). . . . The Free Report was advertised in a separate advertisement (the "Advertisement"). . . . In 1999, the Advertisement was sent to approximately 1,000,000 people. The Free Report advertises a subscription to the Newsletter, which includes receiving the Newsletter and special reports. . . .

. . . .

16. Reynolds'[s] subscriptions to the Newsletter, like all other subscriptions to the Newsletter, included receiving the Newsletter and supplemental information via Flash Bulletins by fax or e-mail and access to Internet hotline updates by e-mail, fax or a recorded telephone message.

. . . .

19. Reynolds received and/or had access to the same Newsletters, Flash Bulletins and hotline updates that were sent or made available to every subscriber of the Newsletter.

. . . .

29. Phillips has no knowledge of Reynolds'[s] individual, personalized financial conditions or any other personal matter of Reynolds.

Reynolds avers in his affidavit that the newsletter, as supplemented with faxed updates and access to a telephone hotline, is

> much different from the investment information in a newspaper or magazine, like the New York Times, the Fort Worth Star Telegram or U.S. News. . . . The New York Times and the Fort Worth Star–Telegram are regular newspapers. They can both be bought freely at newsstands in many places, including street corners, stores and even at airports. The Murphy Technology Investing Newsletter cannot be purchased at any of these types of locations. . . . The only way to get access to the Murphy TI Newsletter is to buy a subscription. . . . The newsletter informs the subscribers that it is not supposed to be shown to anyone who is not a subscriber. It can also be accessed on line; but again it is not supposed to be shown to anyone who is not a subscriber. In order to access it on line one must have an access code. The code is changed frequently. The subscription also allows a series of telephone access hotline updates. To access . . . Hotlines for the phone updates, one must first call a phone number, and then use a special access code. Again, the code is changed often.

According to Reynolds's affidavit, the purpose of the access code is to prevent non-subscribers from accessing the hotline. Reynolds also avers that the fax updates are limited to subscribers and are not supposed to be shared with anyone else. Reynolds further avers that "[b]y contrast, the newspapers and U.S. News do not offer subscribers Hotlines or Flash Bulletins. The purchased information can be shared freely and without restriction." According to his affidavit, these types of publications are available at public libraries, but *Technology Investing* is not.

We hold that the summary judgment evidence established as a matter of law

that *Technology Investing*, like the newsletters at issue in *Lowe* and *Ginsburg*, "is offered to the general public and the information provided in the publication is of a general nature, that is, it is not specifically tailored to [the] financial situation of any individual subscriber." *Ginsburg*, 915 F.Supp. at 739. That the newsletter was available only to subscribers, was supplemented by hotline access and "Flash Bulletins," and is not as widely published as many well-known newspapers does not change the general nature of the publication. The focus in *Lowe* was not the number of subscribers to a particular publication but the generalized nature of content of the publication. *Lowe*, 472 U.S. at 208, 105 S.Ct. at 2572. Here, there is no evidence that the pool of potential subscribers was limited only to a certain group or that any of the advice contained in the newsletter, flash bulletins, or hotline updates was specifically tailored to the financial condition or other circumstances of any individual subscriber. To the contrary, the issues of the newsletter included in the summary judgment evidence show that general advice was given. Accordingly, the trial court did not err by granting summary judgment on First Amendment grounds on Reynolds's negligence and negligent misrepresentation claims.[20] We overrule Reynolds's first and second issues.

Because summary judgment would not have been proper on First Amendment grounds as to Reynolds's breach of contract, fraud and misrepresentation, and DTPA claims, we must examine the other summary judgment grounds asserted by appellees with respect to those claims.

### Breach of Contract

■ Appellees contend that they are entitled to summary judgment as a matter of law on Reynolds's breach of contract claim because the evidence shows that they complied with the only agreement between the parties—to supply an investment newsletter. Appellees presented evidence showing that they sent Reynolds issues of the newsletter in accordance with his subscription. Reynolds does not claim that he did not receive the newsletter as promised. Instead, he complains about the quality of the advice in the newsletter. He claims that he and appellees agreed that appellees would provide him with expert advice and they did not.[21]

Specifically, Reynolds contends (1) that Murphy promised his subscribers that if they followed his advice, they would make money and (2) that Murphy did not give his best advice; therefore, he failed to

---

20. Accordingly, summary judgment was also proper on Reynolds's negligence per se claim. *See Zavala v. Trujillo*, 883 S.W.2d 242, 246 (Tex.App.-El Paso 1994, writ denied) (holding that "negligence per se is not a cause of action separate and independent from a common law negligence cause of action. Negligence per se is merely one method of **proving**, through proof of an unexcused violation of a penal statute designed to protect the class of persons to which the injured party belongs, the breach of duty required in any negligence cause of action, establishing negligence as a matter of law" (citation and footnote omitted)).

21. Some of the newsletters appellees presented as summary judgment evidence contain a one-sentence disclaimer in small type, which states, "Michael Murphy's Technology Investing bases its recommendations and forecasts on analytical techniques and sources found to be reliable in the past, but future accuracy and profitable results cannot be guaranteed." The disclaimer is located at the bottom of the page in the middle of other information about the newsletter, such as the date of the copyright and instructions for making address changes. The disclaimer is not bolded, italicized, or in any other way set apart from the other information, nor is it included in the body of the newsletter.

meet his contractual obligations. Reynolds points to evidence that

> Murphy advised *Technology Investing Newsletter* subscribers to "hold" onto Microsoft anticipating a growth value; [22] ... and, at the same time provided advice to subscribers to a different service to sell their Microsoft stock anticipating a drop in value.... Reynolds followed the advice to hold Microsoft, having never received Murphy's advice to sell it.... As a result he lost money in that time period as his shares lost value.

■ Appellees attached to their summary judgment motion a copy of the initial mailing Reynolds received and a copy of the free report that he ordered as solicited in the mailing. A review of those mailings shows that much of the so-called promises are puffery.[23] For example, the newsletter states, "And for the past years, I've made money for other people—people like you...." It also claims that Murphy's method is "[t]he safest possible way to invest in the future," and that it "can help you invest in the future so that you multiply your wealth up to *five times* over the next 10 years."[24] None of these statements makes any specific promises, however.

Towards the end of the free report is a list entitled, "Besides making you rich, what can I do for you?" Among the items listed are **"I will tell you what you're not being told** about what's really going on in technology stocks," **"I will give you the safest way to invest** in very high growth companies," and **"I will give you the confidence to invest in things you understand."** Reynolds does not allege that appellees broke any of these specific promises. In the same list is an item stating, **"But I cannot give you overnight fortunes** ... our perspective is long term."

The only specific example of bad advice that Reynolds alleges is the different advice given about Microsoft stock. Attached to his summary judgment response are copies of pages from the August 2000 *Overpriced Stock Service,* which states at the beginning, "WARNING! SUBSTANTIAL SHORT SELLING IS FOR PROFESSIONALS AND SOPHISTICATED INDIVIDUAL INVESTORS ONLY. START SMALL! DIVERSIFY AND SET FIRM STOP LOSS POINTS. PLEASE USE DISCRETION IN DISCUSSING SHORT SALE IDEAS WITH THE PRESS OR NONSUBSCRIBERS." It further notes, "Let us explain exactly why we turned short-term negative on the technology stocks and recommended several trading shorts on the Hotline." It later states that "although we like many of these stocks long term, the money directly ahead looks to us to be on the short side."

As evidence that different advice was given in the August 2000 issue of *Technology Investing,* Reynolds points us to an exhibit attached as evidence to his motion for continuance. But this evidence does not show that the advice in the *Overpriced*

---

**22.** Reynolds does not specify whether he bought Microsoft stock initially in reliance on the advice in *Technology Investing,* only that he did not sell it when the price dropped in reliance on Murphy's advice.

**23.** "Puffery" is an expression of opinion by a seller not made as a representation of fact. *Dowling v. NADW Mktg., Inc.,* 631 S.W.2d 726, 729 (Tex.1982).

**24.** Other examples from the free report are, "If you are on the right side of this revolution your investments will ride high indeed over the next several months," "You don't need to guess how to make a fortune from the new 'invisible computer' revolution ... because I will tell you exactly how to do it," and "I would like the opportunity to guide you through this wonderful feast, and give you a way to savor ... **the riches of the future, today.**"

*Stock Service* was any better or worse than the advice given in the *Technology Investing* newsletter. In fact, the advice appears to be almost identical. An excerpt from that issue is as follows:

> I want you to sell EMC [a different company's stock] ... I am moving all of our other stocks [including Microsoft] to a "hold" until it looks as though we're nearing the bottom of the slump. I will tell you immediately on the Hotline ... as soon as it's safe to resume buying. Long-term investors don't have to sell any other *Technology Investing* recommendations—they will be higher by year's end or early in 2001 as business comes back strongly in the fourth quarter. Shorter-term investors with taxable gains also shouldn't sell anything else....

However, shorter-term investors who can offset realized gains and losses, or those who have tax-free accounts, may want to lock in your gains and take some money off the table that would be available to reinvest at the lower prices I see coming. The most vulnerable of our stocks probably are ... MSFT [defined earlier as Microsoft]. If you are going to take some short-term profits, those would be the stocks to trade on any up days during the slump.

Assuming Murphy is the author of the *Overpriced Stock Service*, which we find no evidence of, this evidence does not raise a fact issue on whether appellees breached any promises to Reynolds. The two publications appear to have exactly the same advice with respect to short-selling Microsoft stock. The information regarding holding Microsoft stock was contained in the *Technology Investing* newsletter but not the *Overpriced Stock Service*; however, the evidence shows that the *Overpriced*

*Stock Service* was geared toward short-selling, and the *Technology Investing* newsletter was geared toward long-term gains. Because Reynolds did not present evidence raising a fact issue as to whether appellees breached any agreement with him, we hold that appellees were entitled to summary judgment on Reynolds's breach of contract claim.

### Fraud and Misrepresentation

 Reynolds further contends that he raised a fact issue as to whether appellees engaged in fraud and misrepresentation by failing to disclose that Murphy has a prior criminal record and a past history of drug use, thus misrepresenting Murphy's qualifications and experience. Reynolds alleges that

> on April 30, 2002, [he] learned for the first time ... the facts that Murphy had undergone a mind altering experience after he had taken LSD in the [1960s] and that, afterward, Murphy had robbed a bank when he fell on hard times and that Murphy was convicted for that crime of bank robbery in a federal court.

Reynolds also alleged that he learned Murphy had robbed more than one bank and that he had used a pistol in the commission of the offenses. It was as a result of these discoveries, Reynolds alleges, that he realized Murphy and Phillips were perpetrating a scam. The thrust of Reynolds's argument is that appellees represented Murphy's "talents and skills in an untrue light" because they "held Murphy out as an 'expert,' a 'guru,' yet at the same time withheld information that might lead people to question his judgment[:] the fact that he committed armed robbery in his salad days,[25] used drugs, and managed poorly performing funds."

---

25. Defined by Webster's Dictionary as "days of youthful inexperience or indiscretion."

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2002 (3d ed.2002).

Appellees attached to their summary judgment motion an affidavit from Murphy, in which he averred that in 1966 he was convicted of "federal crimes which could commonly be called bank robbery" and that "President Nixon pardoned [him] of those crimes." A copy of the pardon is also attached to the motion. He also averred that he has disclosed these matters in "various published articles" and in one of his books. Murphy also avers that in the 1960s he "twice used morning glory seeds, an LSD analogue, before LSD was made illegal." Appellees do not contend that Murphy's past history of drug use and bank robbery was ever disclosed in the newsletter, but they did attach to their summary judgment motion pages from Murphy's book in which he discloses the information. Murphy's book was promoted in the Free Report that solicited subscriptions to the newsletter.

■ A person commits fraud by (1) making a false, material misrepresentation (2) that the person either knows to be false or asserts recklessly without knowledge of its truth (3) with the intent that the misrepresentation be acted upon, (4) and the person to whom the misrepresentation is made acts in reliance upon it (5) and is injured as a result. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex.1998) (op. on reh'g); *Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W.3d 325, 345 (Tex.App.-Fort Worth 2003, pet. denied). A misrepresentation may consist of the concealment or nondisclosure of a material fact when there is a duty to disclose. *Cus-*

*tom Leasing, Inc. v. Tex. Bank & Trust Co.*, 516 S.W.2d 138, 142 (Tex.1974); *Miller*, 142 S.W.3d at 345. The duty to disclose arises when one party knows that the other party is ignorant of the true facts and does not have an equal opportunity to discover the truth. *Miller*, 142 S.W.3d at 345. Whether a duty to disclose exists is a question of law. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex.2001).[26]

Here, appellees contend that they had no duty to disclose details about Murphy's past criminal history to Reynolds because they did not know Reynolds was unaware of those details and because they did not intend for Reynolds or any other subscriber to rely on the absence of such details in subscribing to the newsletter. In addition, they argue that because they never made any representation to Reynolds about Murphy's personal history, there was no partial, misleading impression that required further disclosures.

Both Murphy and Bishop[27] averred in their affidavits that they did not intend for any person "to subscribe or not subscribe to the [n]ewsletter based on knowing or not knowing about [Murphy's] federal crimes and drug use in the 1960[ ]s." Murphy further avers that he has publicly disclosed his past history of armed bank robbery and drug use in "various published articles" and in an investing book he wrote.[28]

According to Bishop's affidavit, "[t]he approximate initial circulation of the [n]ewsletter as of January 1999 was to 1,400 subscribers and it was circulated to

---

**26.** In *Bradford*, the supreme court expressly stated that it has not adopted section 551 of the Restatement (Second) of Torts, which recognizes a general duty to disclose facts in a commercial setting when one party does not make an affirmative misrepresentation, but its partial disclosures are misleading in light of what facts it does not disclose. *Id.* at 756.

**27.** Bishop is the Senior Vice President of Phillips.

**28.** This book is advertised in the Free Report initially sent to potential subscribers, mentioned above.

between 1,400 and 103,000 subscribers each month from that time to the present [April 2003]." Both Murphy and Bishop averred that they had no knowledge of "Reynolds' individual, personalized financial conditions or any other personal matter of Reynolds."

In his summary judgment affidavit, Reynolds averred as follows:

> Now the [appellees] are trying to tell this court that a book and articles told of some of the more sordid and revealing true facts about Murphy; in this attempt the [appellees] are being deceptive and disingenuous, for they never made any of this available to me. I knew nothing of it until I happened on my own to learn some of it in late April, 2002, to my shock and dismay.
>
> ... The [appellees] failed to disclose significant and relevant information about Murphy, and even his true first name,[29] making it much more difficult for their intended victims, including me, to learn anything about the awful truth of what these [appellees] were really up to, and really doing....
>
> ... Notwithstanding my own diligence, I did not discover the awful truth of what was going on, and learn of the false, misleading, deceptive and fraudulent acts and practices of the [appellees] until on or about April 30, 2002.

The evidence shows that although Phillips and Murphy did not include the information in the newsletter, as a disclaimer or otherwise, they did not attempt to conceal the information either. Murphy discussed

it candidly in his book and advertised that book to potential subscribers. And despite Reynolds's conclusory statements that appellees intentionally made it difficult for subscribers and potential subscribers to discover the information, he failed to bring forward any specific evidence regarding his attempts to investigate Murphy and his past history. To the contrary, Reynolds clearly states in his affidavit that he was able to discover this information on his own. We hold that Reynolds did not bring forward any evidence raising a fact issue as to whether appellees were actually aware that he did not know about Murphy's past history or that he did not have an opportunity to discover it. *See Bradford*, 48 S.W.3d at 754–56 (holding that when jury charged as to fraud by concealment or partial disclosure—without affirmatively adopting theory as valid cause of action—that plaintiffs' fraud claim failed because *they* did not bring forward any evidence that defendant knew Bradford was unaware of information that was not disclosed or that he did not have an equal opportunity to discover it).[30]

 Reynolds further alleged that appellees misrepresented Murphy's talents and skills by failing to disclose his past performance as a fund manager, which Reynolds claims was poor. But appellees did not move for summary judgment as to this allegation. A trial court cannot grant summary judgment except on the grounds expressly presented in the motion. *Johnson*, 73 S.W.3d at 204; *Sci. Spectrum, Inc.*, 941 S.W.2d at 912. Thus, a traditional

---

**29.** According to evidence in the summary judgment record, Murphy's full name under which he was convicted and pardoned is John Michael Murphy. The book in which Murphy discusses his past history lists his name as Michael Murphy.

**30.** Moreover, we note that the alleged partial representations about which Reynolds complains—that Murphy was an expert stock analyst—all relate to Murphy's present skills, not his character or his past. Reynolds points to no evidence that Murphy or Phillips painted a false picture of Murphy as having a good moral character either in the past or in the future.

summary judgment would not have been proper as to this part of Reynolds's fraud and misrepresentation claim. Moreover, appellees' no-evidence summary judgment was also premised only on "the nondisclosure of Murphy's personal history." Thus, a no-evidence summary judgment would not have been proper either. *Hinkle v. Adams*, 74 S.W.3d 189, 193 (Tex.App.-Texarkana 2002, no pet.).

Accordingly, we hold that the trial court did not err by granting summary judgment for appellees on Reynolds's fraud and misrepresentation claims with respect to the nondisclosure of Murphy's past drug use and criminal history. But we further hold that because appellees did not move for summary judgment as to whether appellees misrepresented Murphy's "talents and skills" by failing to disclose his past performance as a fund manager, they were not entitled to either a traditional or no-evidence summary judgment on that particular claim.

## Violation of DTPA

Appellees moved for summary judgment on five grounds as to Reynolds's DTPA claims. We turn first to appellees' contention that no statements of appellees support a DTPA claim because it is dispositive. *See* Tex.R.App. P. 47.1. In his second amended petition, Reynolds claimed that appellees made the following misrepresentations:

- Murphy had special skill and expertise in the field of investing and more especially technology investments;
- Murphy was an expert in technology investing with great experience and expertise;
- Murphy created an investment methodology based on highly reliable principles and that those who invested in accordance with his philosophy would realize great returns on investments.

The growth flow method developed by Murphy was proven;

- Murphy is an investment adviser with twenty years of experience who carefully and personally researched companies before he gave advice;
- Murphy would safely guide investors so they could invest and make profits safely, and he had special knowledge and expertise that enabled him to do this;
- Murphy was a person who ran investment funds and even managed private investment portfolios; and
- Murphy gave constant, strong, equivocal assurances that the market would rebound and go even higher than ever and investors should maintain and not sell his recommended core holdings.

Reynolds also claims that appellees violated the DTPA by failing to disclose Murphy's two episodes of drug use and his past criminal history.

To prove his DTPA claims, Reynolds must show that appellees engaged in a false, misleading, or deceptive act or practice enumerated under section 17.46(b) of the DTPA. Tex. Bus. & Com.Code Ann. § 17.46(b); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995); *Chandler v. Gene Messer Ford, Inc.*, 81 S.W.3d 493, 501 (Tex.App.-Eastland 2002, pet. denied). Reynolds alleges specifically that these alleged misrepresentations violate the following subsections of 17.46(b):

(b) Except as provided in Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts:

. . . .

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quan-

tities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

. . . .

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (8) disparaging the goods, services, or business of another by false or misleading representation of facts;

. . . .

(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

. . . .

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

TEX. BUS. & COM.CODE ANN. § 17.46(b)(5), (7), (8), (12), (24).

■ Reynolds's claims under section 17.46(b)(5), (7), and (12) relate to his claims that appellees misrepresented Murphy's skill and expertise as a stock analyst. Appellees attached as summary judgment evidence excerpts from third party books and articles including Murphy in a list of experts, describing him as "the man many regard as America's top technology guru," and a "near-legend in . . . Silicon Valley for his stock-picking prowess." One article says Murphy's model portfolio ranked fifth best among 77 newsletters tracked by Hulbert Financial Digest. *See supra* page 267, n. 21. Appellees' summary judgment

evidence also references the fact that Murphy has been involved in stock analysis in some form or fashion since the late 1960s.

We have discussed previously most of the evidence Reynolds points to as raising a fact issue on his claims, specifically the advice given in the *Overpriced Stock Service* about Microsoft and Murphy's past history. Reynolds also attached to his summary judgment other evidence that he claims shows Murphy is in fact a failure at analyzing and picking tech stocks, even though he claims he is a success. This evidence consists of a copy of an article purporting to be from TheStreet.com dated February 20, 2002.[31] Part of this article is entitled "The Definition of Chutzpah":

> There's a fellow named Michael Murphy who, despite a truly dismal record as a fund manager, keeps spamming investors about his latest picks.

> Murphy's emails, replete with grammatical and spelling errors, urge recipients to sign up for a free trial of his Technology Investing newsletter. I'll refrain from linking to Murphy's site, where you'll find a biography touting him as "America's premier technology stock analyst" and former head of an unnamed software company. He's the author of Every Investor's Guide to High Tech Stocks and Mutual Funds and pens two other newsletters, The California Technology Stock Letter and Biotech Investing. Murphy hadn't returned a call seeking comment as of Wednesday afternoon.

> On his site, Murphy, a Harvard grad who's no stranger to the investment conference circuit, touts a 66.4% cumulative return since starting his newsletter in

---

**31.** Reynolds does not reference this evidence in his briefs; however, we will nevertheless discuss it as part of our review of the summary judgment evidence.

late 1998, though no specific dates are provided on his bio page. That looks good vs. the Nasdaq Composite, but it doesn't really match up with the returns of his two tech funds, two of the wormiest apples in that ravaged bin.

The Monterey Murphy New World Technology fund, which he's run since its 1993 launch, averages a stunning 20% annual loss over the past five years, compared with a 6% annual gain for its average peer. That's dead last among all tech funds, according to Chicago research house Morningstar.

The Monterey Murphy New World Core Technology fund, which lives in the convertible bond fund category, has amassed an equally stunning record. Murphy started running the fund in 1996, and it averages an annual 7.5% loss over the past five years.

Adding insult to injury, both funds carry a 1.99% annual expense ratio, well above their average peer's 1.73%. A subscription to this guru's newsletter costs $195 per year, though it's only $375 for two years.

What a bargain.

But appellees' summary judgment evidence contains a copy of the March 2000 issue of *Technology Investing*, in which Murphy states,

> The mutual funds I manage are aggressive, and I raised about 50% cash at the end of 1999. (I didn't advise you to do this since we have a more conservative, long-term approach in *Technology Investing*.) But I've now put most of that money back to work as individual stocks came down, and I want you to do the same.

The issues of *Technology Investing* relied on by both appellees and Reynolds consistently emphasize the long-term investment approach described in that publication as opposed to more aggressive or short-term methods advocated by Murphy in different contexts, including, apparently, the investment funds he manages. We hold that Reynolds did not raise a fact issue as to his claims under section 17.46(b)(5) and (12).

Although the poor performance records of Murphy's investment funds cited in the article are over a relatively long-term period, we do not believe this raises a fact issue under section 17.46(b)(7) because the newsletter clearly indicates that the investment funds Murphy managed were separate from and more aggressive than the investments recommended in *Technology Investing* and involved a different strategy. But even if this evidence raises a fact issue as to whether Murphy misrepresented his experience and expertise in picking investments, it does not raise a fact issue as to appellees' liability under section 17.46(b)(7). Appellees also moved for summary judgment on Reynolds's DTPA claims on the ground that Reynolds could not prove causation because he admits he did not follow Murphy's advice to "hold" the recommended stocks long-term; thus, Reynolds's losses were caused by his decision to sell his stocks against Murphy's advice rather than any representations about Murphy's stock-picking prowess. *See* TEX. BUS. & COM.CODE ANN. § 17.50(a) (Vernon 2002) (DTPA cause of action may be maintained when deceptive act a "producing cause" of economic or mental anguish damages); *Brown v. Bank of Galveston, Nat'l Assoc.*, 963 S.W.2d 511, 514 (Tex.1998) ("Producing cause requires that the acts be both a cause-in-fact and a 'substantial factor' in causing the injuries."). We agree and hold that Reynolds failed to raise a fact issue under section 17.46(b)(7).

We further hold that Reynolds did not raise a fact issue on his claim

under section 17.46(b)(8). That section applies only to misrepresentations of fact, not opinion. *See Tweedell v. Hochheim Prairie Farm Mut. Ins. Ass'n*, 1 S.W.3d 304, 309 n. 10 (Tex.App.-Corpus Christi 1999, no pet.). The statements Reynolds attributes to Murphy regarding other analysts-that one analyst was headed for hell because of his stock picks and that he had a "wall of shame" for analysts he claimed were poor performers-are statements of opinion, not fact. Thus, Reynolds's summary judgment evidence does not raise a fact issue on his section 17.46(b)(8) claim.

■ Appellees also moved for summary judgment on Reynolds's 17.46(b)(24) claim: that appellees failed to disclose Murphy's past history for the purpose of inducing him into subscribing to the newsletter. Appellees provided Murphy's and Bishop's affidavits in which they averred that they never intended any person to rely on the absence of information about Murphy's past history in deciding whether or not to subscribe to the newsletter. And although Reynolds brought forward evidence that he would not have subscribed to the newsletter had he known of Murphy's past history, he did not bring forward any evidence raising a fact issue as to appellees' intent in failing to disclose this information in the newsletter, as opposed to the other media in which it had already been disclosed. *See Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 744 (Tex.App.-Fort Worth 2005, no pet.). Thus, we hold that appellees were entitled to summary judgment on Reynolds's 17.46(b)(24) claim.

Accordingly, we overrule Reynolds's sixth issue as to his fraud and misrepresentation claims based on nondisclosure and his negligence, negligent misrepresentation, breach of contract, and DTPA claims. We sustain his sixth issue as to his fraud and misrepresentation claims based on the allegation that appellees represented Murphy's talents and skills in an untrue light by failing to disclose his past performance as a fund manager.

### Conclusion

Having determined that appellees were entitled to summary judgment on all of Reynolds's claims except his claim that appellees engaged in fraud and misrepresentation by failing to disclose Murphy's past performance as a fund manager, we affirm the trial court's judgment except as to that claim. We reverse and remand the claim that appellees engaged in fraud and misrepresentation by failing to disclose Murphy's past performance as a fund manager for further proceedings consistent with this opinion.

MCCOY, J., filed a concurring opinion.

BOB McCOY, Justice, concurring.

I concur in the result reached by the majority but not in every holding. The majority holds that "[w]e agree with the analysis and holdings in these cases," referring in part to *Daniel v. Dow Jones & Co.*, 137 Misc.2d 94, 520 N.Y.S.2d 334, 336–40 (N.Y.Civ.Ct.1987), and specifically that "the relationship of the parties was *'functionally identical to that of a purchaser of a newspaper'* and consequently there was no special relationship between the parties." *See* Maj. Op. at 264–65 (footnote omitted) (emphasis supplied). Newspapers are available *gratis* many places, such as the public library, business lobbies, etc. However, the investment service in this case, as pointed out by Reynolds, is only available to the reader by subscription and is not supposed to be shown to anyone other than the subscriber according to the newsletter. Additionally, the investment service in this case includes faxed updates and a telephone hotline, requires a frequently-changed on-line access code, and has a telephone access code to the hotline.

I cannot agree these are functional equivalents.

I also cannot subscribe to the argument that there was no duty to provide Reynolds with information about the background of Murphy because appellees "did not know Reynolds was unaware of those details and because they did not intend for Reynolds or other subscribers to rely on the absence of such details in subscribing to the newsletter." *See* Maj. Op. at 270. Such an argument could be made in virtually every misrepresentation case and would require Reynolds to prove that appellees knew that he did not know. The method of this proof, would, I am sure, be as interesting as trying to understand what is meant by the assertion that appellees did not intend for Reynolds to rely on an absence of information. For these reasons, I concur with the overall result of the majority but not with the aforementioned.