COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-433-CV

 

 

W.L. LINDEMANN OPERATING                                               APPELLANT

COMPANY,
INC.

 

                                                   V.

 

JOYCE
STRANGE, INDIVIDUALLY 

AND
AS TRUSTEE FOR THE JOYCE 

STRANGE MARITAL TRUST                                                     APPELLEE

 

                                              ------------

 

             FROM
THE 97TH DISTRICT COURT OF ARCHER COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------








This is an appeal from a jury
verdict in favor of appellee Joyce Strange, individually and as Trustee for the
Joyce Strange Marital Trust, in a case involving production from an oil lease
in Archer County, Texas.  In five issues,
appellant W.L. Lindemann Operating Company, Inc. contends generally that the
evidence is legally and factually insufficient to support the jury=s findings on willful commingling, fraud, and damages.  We affirm in part and reverse and render in
part.

                                        Background Facts

Appellee was married to Doug
Strange for over twenty years.  Strange
developed and operated oil leases; appellee worked for him as a
bookkeeper.  Strange did business through
Brock & Strange Oil Company, a partnership between him and Joe Wayne
Brock.  Beginning in the 1960s, Brock
& Strange developed leases and drilled oil wells with W.L. ARusty@
Lindemann.  Although their businesses
were separate, according to appellee, her Ahusband would drill a well and Rusty would take an interest@ in it.








Rusty and Strange verbally
agreed that Rusty would drill and operate a well in Archer County on one of
Strange=s leases known as the D.D. Strange. 
Strange gave Rusty a fifty percent working interest in the lease.[1]  Rusty drilled the first of two wells on the
D.D. Strange in 1991; Strange passed away in 1992.  Upon Strange=s death, appellee acquired his working interest and a royalty interest
in the wells, individually and as a beneficiary of the Joyce Strange Marital
Trust, through inheritance from her husband=s estate.  Appellee also took
over his interest in Brock & Strange. 
Rusty continued to operate the D.D. Strange, through appellant,[2]
after appellee acquired these interests.

After Rusty drilled the first
well on the D.D. Strange, he also began to develop and operate the Powell lease
located to the north of the D.D. Strange. 
Rusty and his family members own 7/8ths of the working interests in the
Powell.[3]  Around the same time, Rusty=s son Doug Lindemann began to develop the Hoff lease, located to the
east of the D.D. Strange.  Rusty=s sons William, Robert, and other family members own all the working
interests in the Hoff.  To the south of
the Hoff is the O=Keefe AB@ lease,
which Rusty also operated and in which he owned an approximately one-half
working interest.[4]  Brock & Strange also owns interests in
the O=Keefe.








Appellee testified that she
did not have any contact with Rusty about the D.D. Strange wells between 1991
and 2000.  Brock, who acted as
superintendent on the Brock & Strange leases, informed her about matters
related to the D.D. Strange.  According
to appellee, Brock Atakes care
of all the leases.  He goes out and
checks them and makes sure they=re all pumping properly and just takes care of all the field
superintendent work.@  Conoco purchased production on the D.D.
Strange while it was producing.








In 2000, appellee and Brock
became concerned about the D.D. Strange because, according to appellee, A[i]t quit producing oil.@  Appellee said she found out
about this because she stopped Agetting an oil run[[5]]
out from the oil companies.@  Brock checked both wells on
the D.D. Strange;[6]
they looked as if they had been shut in for some time.[7]  Brock and appellee talked about the problem
and then went to the lease together to investigate.  When Brock and appellee opened one of the
valves on the well, according to appellee, Aoil just gushed out . . . like gangbusters.@  Additionally, the screw that
held the lever properly on the saltwater separator,[8]
or saltwater knock-out,[9]
was not there.

Appellee then contacted
counsel to Aget [her]
lease back.@  Appellee=s attorney was able to negotiate a deal with Willowbend InvestmentsCa company owned by Lee Murchison and Rusty=s son William, to whom Rusty had transferred his interest in the D.D.
Strange effective March 1, 2001. 
Willowbend let Brock & Strange take over operation of the D.D.
Strange, and Willowbend transferred at least some of its interest in the D.D.
Strange to appellee.[10]








Before Brock & Strange
took over the lease, it was producing Aabout nothing.@  After they took over operation of the lease,
according to appellee, ABrock went
down and flipped a switch[,] and it started gushing like it should have to
begin with.@  Additionally, about a month later, Brock
acidized the well, and Aproduction
has been going up ever since.@  The evidence at trial
confirmed that production on the D.D. Strange increased significantly after
Brock & Strange took over operating the lease.

Appellee filed suit against
appellant in 2001, claiming, in appellee=s words, that Rusty and appellant Ashut down [her] lease[,] . . . pumped all the leases around [her,] and
just took the oil out from under [her] lease.@  A jury trial began October 11,
2005, upon appellee=s fourth
amended petition, in which she specifically alleged that appellant either
drained oil from beneath the D.D. Strange, failed to properly produce the D.D.
Strange and O=Keefe
leases, or both.  She also alleged causes
of action for fraud, conspiracy, negligent misrepresentation, conversion, civil
theft under section 134.001 of the civil practice and remedies code, unjust
enrichment, breach of contract, fraudulent concealment, and wrongful
commingling.  She requested actual
damages, the imposition of a constructive trust, exemplary damages, and
attorneys= fees.








On October 17, 2005, after
appellee had rested her case, appellant filed a motion for instructed verdict
as to all of appellee=s
claims.  The trial court granted the
motion as to appellee=s
conspiracy, civil theft, and unjust enrichment claims and her contention that
appellant improperly reported the quantity of oil produced from the D.D.
Strange and O=Keefe leases
to the Texas Railroad Commission.  But
the trial court denied the motion as to all other claims.  Appellant also filed a motion for instructed
verdict on appellee=s fraud,
conversion, and willful commingling claims after the close of its evidence,
which the trial court denied as to all claims.

The jury found that
substantial drainage had occurred from the D.D. Strange lease and that
appellant had failed to act as a reasonably prudent operator by failing to
prevent substantial drainage from the D.D. Strange.  It awarded appellee past damages of $66,093.00
as to her royalty interest in the lease and $642,959 in past damages as to her
working interest.[11]  The jury also found that no substantial
drainage had occurred from the O=Keefe lease.  The jury
additionally found that appellant had willfully commingled the oil production
from the D.D. Strange, Powell, and Hoff leases, causing damages to appellee of
$1,627,300.  Although the jury found that
Rusty individually did not commit fraud against appellee, it did find that
appellant committed fraud; the jury awarded appellee compensatory damages of
$233,300 and exemplary damages of $200,000. 
Finally, the jury found that appellee was entitled to reasonable
attorneys= fees of
$160,000 for trial, $10,000 for an appeal to the court of appeals, and $10,000
for an appeal to the Supreme Court of Texas.








Appellee moved for judgment
on the jury=s verdict,
and appellant moved to require appellee to elect a remedy as to either her
fraud or drainage claims because both claims were based on the facts underlying
appellee=s drainage claim.  Appellant
also moved to disregard the jury=s findings of substantial drainage and damages for that cause of
action, willful commingling and damages for that cause of action, and fraud and
the actual and exemplary damages for that cause of action; appellant moved to
disregard the jury=s findings
on attorneys= fees as
well.








The trial court entered a
final take-nothing judgment in Rusty=s favor and severed it from the pending suit.[12]  It also entered an order recognizing that
appellee had elected to proceed on her fraud claim as opposed to her drainage
claim; thus, the trial court disregarded the jury=s findings as to wrongful drainage.[13]  The trial court additionally granted
appellant=s motion to
disregard the jury=s findings
as to attorneys= fees;
however, it denied the motion as to all of appellee=s other claims.

On August 28, 2006, the trial
court entered a AJudgment on
the Verdict.@  In it, the court ordered that appellee
recover $1,860,600 from appellant in actual damages and $200,000 in exemplary
damages.  It also awarded prejudgment and
postjudgment interest at the rate of 8.25% and assessed costs against
appellant.  Appellant filed a timely
notice of appeal.

                                         Issues Presented








In five issues, appellant
contends that the evidence is legally and factually insufficient to support the
following jury findings: (1) that appellant willfully commingled oil from the
D.D. Strange lease with oil from the Powell and Hoff leases, (2) that appellant
committed fraud, (3) that appellee was damaged in the amount of $1,627,300 for
the willful commingling, (4) that appellee sustained damages in the amount of
$233,300 for the fraud, and (5) that appellee is entitled to exemplary damages
of $200,000.[14]  We will first address appellant=s second issue related to the jury=s fraud findings because the fraud evidence is also relevant to
appellee=s wrongful commingling claim.

                   Legal and
Factual Sufficiency Standards of Review

Legal
Sufficiency

We may
sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.  Uniroyal Goodrich Tire
Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526
U.S. 1040 (1999); Robert W. Calvert, "No Evidence" and
"Insufficient Evidence" Points of Error, 38 TEX. L. REV. 361, 362B63
(1960).  In determining whether there is
legally sufficient evidence to support the finding under review, we must
consider evidence favorable to the finding if a reasonable fact-finder could
and disregard evidence contrary to the finding unless a reasonable fact-finder
could not.  City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).








Anything more than a
scintilla of evidence is legally sufficient to support the finding.  Cont=l Coffee Prods. Co. v. Cazarez, 937 S.W.2d
444, 450 (Tex. 1996); Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex.
1996).  When the evidence offered to
prove a vital fact is so weak as to do no more than create a mere surmise or
suspicion of its existence, the evidence is no more than a scintilla and, in
legal effect, is no evidence.  Kindred
v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).  More than a scintilla of evidence exists if
the evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of a vital fact.  Rocor Int=l, Inc. v. Nat=l Union Fire Ins. Co., 77 S.W.3d
253, 262 (Tex. 2002).

Any ultimate fact may be
proved by circumstantial evidence.  Russell
v. Russell, 865 S.W.2d 929, 933 (Tex. 1993).  A fact is established by circumstantial
evidence when the fact may be fairly and reasonably inferred from other facts
proved in the case.  Id.  However, to withstand a legal sufficiency
challenge, circumstantial evidence still must consist of more than a
scintilla.  Blount v. Bordens, Inc.,
910 S.W.2d 931, 933 (Tex. 1995).

Factual Sufficiency








An assertion that the
evidence is factually insufficient to support a fact finding means that the
evidence supporting the finding is so weak or the evidence to the contrary is
so overwhelming that the answer should be set aside and a new trial ordered.  Garza v. Alviar, 395 S.W.2d 821, 823
(Tex. 1965).  We are required to consider
all of the evidence in the case in making this determination, not just the
evidence that supports the finding.  Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex.), cert. denied,
525 U.S. 1017 (1998).

Exemplary Damages Standard of Review








To be entitled to an award of
punitive damages, appellee had to prove by clear and convincing evidence that
the harm with respect to which she seeks recovery of exemplary damages resulted
from fraud or malice committed by appellant. 
See Tex. Civ. Prac. &
Rem. Code Ann. ' 41.003
(Vernon Supp. 2007).  Clear and
convincing evidence is that measure or degree of proof that will produce in the
mind of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established.  Tex. Civ. Prac. & Rem. Code Ann ' 41.001(2) (Vernon Supp. 2007); Transp. Ins. Co. v. Moriel, 879
S.W.2d 10, 31 (Tex. 1994).  This
intermediate standard falls between the preponderance standard of civil
proceedings and the reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979).  While the proof must weigh heavier than
merely the greater weight of the credible evidence, there is no requirement
that the evidence be unequivocal or undisputed. 
Addington, 588 S.W.2d at 570.

In reviewing the evidence for
legal sufficiency, we must determine whether the evidence is such that a
fact-finder could reasonably form a firm belief or conviction that its finding was
true.  Diamond Shamrock Ref. Co. v.
Hall, 168 S.W.3d 164, 170 (Tex. 2005); Sw. Bell Tel. Co. v. Garza,
164 S.W.3d 607, 627 (Tex. 2004).  We must
review all the evidence in the light most favorable to the finding.  Hall, 168 S.W.3d at 170; Garza,
164 S.W.3d at 627.  This means that we
must assume that the fact-finder resolved any disputed facts in favor of its
finding if a reasonable fact-finder could have done so.  Hall, 168 S.W.3d at 170; Garza,
164 S.W.3d at 627.  We must also
disregard all evidence that a reasonable fact-finder could have
disbelieved.  Hall, 168 S.W.3d at
170; Garza, 164 S.W.3d at 627.  We
must consider, however, undisputed evidence even if it is contrary to the
finding.  City of Keller v. Wilson,
168 S.W.3d 802, 817 (Tex. 2005); Hall, 168 S.W.3d at 170.  That is, we must consider evidence favorable
to the finding if a reasonable fact-finder could and disregard evidence
contrary to the finding unless a reasonable fact-finder could not.  Wilson, 168 S.W.3d at 827.








Jury
Charge

Absent an
objection to the jury charge, the sufficiency of the evidence is reviewed in
light of the charge submitted.  Wal-Mart
Stores, Inc. v. Sturges, 52 S.W.3d 711, 715 (Tex. 2001); City of Fort
Worth v. Zimlich, 29 S.W.3d 62, 71 (Tex. 2000).  However, when a party properly objects to a
jury question, we review the sufficiency of the evidence in light of the charge
the trial court should have submitted.  St.
Joseph Hosp. v. Wolff, 94 S.W.3d 513, 530 (Tex. 2003); Allen v. Am. Gen.
Fin., Inc., No. 04-06-00273-CV, 2007 WL 4180145, at *8 (Tex. App.CSan Antonio Nov. 28, 2007, pet. filed).

                                                Fraud

In its second issue,
appellant contends that the evidence is legally and factually insufficient to
support the jury=s findings
that appellant committed fraud against appellee and that appellee proved by
clear and convincing evidence that the fraud caused her harm.  Generally, appellant contends that the
evidence shows only that it engaged in good faith business practices typical of
the oil and gas business in Archer County. 
Specifically, appellant claims that the evidence is insufficient to
support the required mental state for fraud and the element of reliance by
appellee; it also challenges evidence of discrete acts, standing alone, as
supporting the fraud claim.  For example,
appellant contends








that the following evidence is insufficient to
support a fraud finding:  (1) evidence
that Brock found a bypass hose on the D.D. Strange No. 1 well that allowed oil
produced from the No. 2 well to go back down into the ground through the No. 1
well, (2) evidence of appellant=s use of electricity from appellee=s wells to operate another well without appellee=s consent or knowledge, (3) evidence that appellant continued to bill
appellee for operating costs on the D.D. Strange even during the period when it
was pumping the well only once per month, and (4) evidence that Rusty told
Brock that he was waiting on the success of a water injection before beginning
to pump the D.D. Strange wells again.

Applicable Law








A party commits fraud by (1)
making a false, material misrepresentation (2) that the party either knows to
be false or asserts recklessly without knowledge of its truth (3) with the
intent that the misrepresentation be acted upon, (4) and the person to whom the
misrepresentation is made acts in reliance upon it (5) and is injured as a
result.  Formosa Plastics Corp. USA v.
Presidio Eng=rs &
Contractors, Inc., 960 S.W.2d 41, 47B48 (Tex. 1998) (op. on reh=g); Reynolds v. Murphy, 188 S.W.3d 252, 270 (Tex. App.CFort Worth 2006, pet. denied) (op. on reh=g), cert. denied, 127 S. Ct. 1839 (2007).  Thus, a statement is not fraudulent unless
the maker knew it was false when he made it or made it recklessly without
knowledge of the truth.  DeSantis v.
Wackenhut Corp., 793 S.W.2d 670, 688 (Tex. 1990), cert. denied, 498
U.S. 1048 (1991).

A misrepresentation may also
consist of the concealment or nondisclosure of a material fact when there is a
duty to disclose.  Custom Leasing,
Inc. v. Tex. Bank & Trust Co., 516 S.W.2d 138, 142 (Tex. 1974); Reynolds,
188 S.W.3d at 270.  The duty to disclose arises
when one party knows that the other party is ignorant of the true facts and
does not have an equal opportunity to discover the truth.  Reynolds, 188 S.W.3d at 270.  Whether a duty to disclose exists is a
question of law.  Bradford v. Vento,
48 S.W.3d 749, 755 (Tex. 2001); Reynolds, 188 S.W.3d at 270.

Fraud is usually not
discernible by direct evidence and is usually so covert or attendant with such
attempts at concealment as to be incapable of proof other than by
circumstantial evidence.  Cotten v. Weatherford
Bancshares, Inc., 187 S.W.3d 687, 707 (Tex. App.CFort Worth 2006, pet. denied); see Spoljaric v. Percival
Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986); Weinberger v. Longer,
222 S.W.3d 557, 562 (Tex. App.CHouston [14th Dist.] 2007, pet. denied).  Motive, past conduct, and related wrongful
acts are thus factors to be considered.  Cotten,
187 S.W.3d at 707.








Applicable
Facts

Appellee=s theory at trial was that appellant committed fraud by
misrepresenting why the D.D. Strange wells were not producing, by failing to
tell appellee that it was not producing the wells, and by concealing a bypass
hose and a separator malfunction[15]
on the wells.  Appellee contended that
all of these contributed to oil in the underlying formation being divertedCor drainedCfrom under
the D.D. Strange so that it could be produced from the Powell, the Hoff, or
bothCleases in which Rusty or his children had the majority interests.








The evidence showed that in
1993, the D.D. Strange wells produced 3,629 barrels of oil, and in 1994, they
produced 1,162 barrels.  In 1995, the
production dropped to 573 barrels and kept steadily declining so that in 1999,
they produced 77 barrels, and in 2000, they produced only 48.  But in 2001, the year Brock & Strange
took over operation of the D.D. Strange, the wells produced 979 barrels:  962 in June through December when Brock &
Strange operated the lease,[16]
15 between March and May, when Willowbend operated the lease, and 2 barrels in
January and February of that year when appellant operated the lease.  The next year Brock & Strange produced
1,746 barrels.  The parties introduced
conflicting evidence for the decline and subsequent increase in production from
the D.D. Strange.

Rusty testified that he owned
a one-half working interest in the D.D. Strange when he operated it.[17]  He also testified that his sons owned the
majority of the working interests in the Hoff. 
According to Rusty, some of the wells in the area produced better than
others, and the D.D. Strange wells were not good producers after 1995.  Rusty testified that when he first started
decreasing production on the D.D. Strange, he pumped the wells once a week at
first, then once a month when the price for a barrel went down to $9.[18]  He wanted to continue holding the lease, that
is, producing it in paying quantities, but he did not want to expend more money
in producing it than it would make in revenue.








Although Rusty testified
initially that he started cutting back production on the D.D. Strange around
the time oil prices were $9 a barrelCwhich the evidence shows was in December 1998 and January 1999Che later testified that the production in 1998, 1999, and most of 2000
was the natural production on the D.D. Strange and that that was all it was
capable of producing.  He then testified
that he started cutting back production in October 2000 because of the decrease
in oil prices. 

Rusty admitted that he did
not decrease production from the Powell during this time, nor did his son Doug
decrease production from the Hoff.  In
addition, contrary to Rusty=s testimony, the evidence shows that after the December 1998-January
1999 low, oil prices began steadily increasing, and by October and November
2000 they were higher than they had been since at least May 1991 (the earliest
date in the record).  













According to Rusty, appellee
and Brock had complained about the operating expenses for the wells.  But Rusty also testified that he made the
decision to decrease production himself; he never consulted Brock.  He agreed that even though the D.D. Strange
was the only lease in the area losing money, he kept billing appellee for the
operating expenses, and he never attempted to acidize the wells.[19]  He did acidize the Powell around the same
time, however.  Rusty at first said that
Brock did not want to acidize the well because of the expense but later
testified that he never asked Brock because of the expense.  Brock testified that he did not have any
conversations with Rusty about expenses on the D.D. Strange before its wells
were shut in and that the only conversation they later had about expenses was
about Brock & Strange being charged for operating expenses while the wells
were not being produced.  Rusty admitted
that instead of telling Brock or appellee that he had decreased production on
the D.D. Strange due to expenses, he told Brock that he was Awaiting on the water to hit@ from one of the wells on the Hoff.[20]  Brock understood this to mean that Rusty was
waiting for the zone to be repressurized by the water being put into one of the
Hoff wells, which he hoped would cause the other wells to produce more
oil.  However, Rusty also testified that
he did not operate an injection well in the area and that he never had.

When Brock told Rusty in
October 2000 that he had been to the D.D. Strange and oil had flowed out of the
casingheads of one of the wells, Rusty told Brock he did not know what he was
talking about.  Rusty said that in
response to Brock=s telling
him this, he went to the lease, and a little gas came out of the well, so he
started producing it.  However, Rusty
also testified that the well would not produce more than one barrel per day and
that if Brock had been telling the truth about oil coming out of the top of the
casing, there would have been forty barrels of oil in the casing.

After Brock told Rusty that
appellee wanted to produce the lease, Rusty sold his interest to Willowbend.  Rusty did not keep any records; however, he
claims he gave them all to Murchison, who owned Willowbend with Rusty=s son William.








Rusty admitted that he had
used electricity from the deep wells on the O=Keefe[21]
without permission to power one of his shallow wells; however, during this
time, he also continued to bill the deep well owners for all the
electricity.  According to Rusty, even
though he did not talk to the lease owners and obtain their permission to use
the electricity at their expense, he also did not charge them for disposing of
water on his shallow lease.  He
explained, AWe just kind
of worked together on them things.@  Brock testified that he
discovered this Amisuse of
electricity@ shortly
after Brock & Strange took over operations on the O=Keefe.  According to Rusty=s son Robert, however, the electricity usage was temporary in 1996 or
1997 and lasted only for about a month or less.

Appellee introduced expert
testimony that the sands in the formation underlying the wells in the D.D.
Strange, Powell, Hoff, and O=Keefe areas communicated; that is, that oil could move from one well
to another if some wells were produced more than others.  She also introduced expert testimony that
appellant did not produce the D.D. Strange to its productive capacity, that the
Hoff produced more than its share of the original oil in place, and that the
D.D. Strange had a much lower recovery than some of the other leases in the
same reservoir.[22]








Analysis - Falsity of Statement and
Mental State

Appellant contends that there
is no evidence or insufficient evidence that Rusty=s statement that he was waiting on the water to hit was falseCor that Rusty intentionally or recklessly misrepresented to Brock or
appellee why he was not producing the D.D. StrangeCbecause there is no or insufficient evidence that Rusty did not really
believe that a water injection would increase production.  Appellant points to the following evidence as
showing that Rusty could have believed that an injection would increase
production on the D.D. Strange:  Aundisputed@ evidence
that one of the wells on the O=Keefe was being operated as an injection well; Masters=s testimony that the D.D. Strange had exhausted its primary productive
capacity in 1996; Rusty=s and Robert=s testimony that they unsuccessfully tried to produce the D.D. Strange
when Brock told Rusty that there was oil coming out of the casinghead on the
No. 2 well; and other evidence that the D.D. Strange was capable of producing
only one barrel a day during this time.








Appellant contends that there
is undisputed evidence that one of the wells on the O=Keefe was being used as an injection well.  There is indeed evidence that one of the O=Keefe wells was permitted as an injection well, and Masters testified
that the O=Keefe No. 3
well was injected beginning in January 1996, according to Texas Railroad
Commission records.  But Rusty testified
that he had never operated a waterflood, or injection well; according to Rusty,
the O=Keefe well merely disposed of water produced from a different lease,
the Stallcup, and not any additional water for the purpose of promoting
secondary recovery.[23]  An inference can be made from Masters=s testimony that the O=Keefe No. 3 was injected until October 2001; he testified that when
Brock & Strange took over and moved injection to the No. 4 wellCin accordance with the permitCproduction in the reservoir decreased rather than holding steady as it
had been doing.  Thus, there is
conflicting evidence as to whether there were any injections on the O=Keefe around the time Brock said Rusty told him he was waiting on the
water to hit.  More importantly, both
Brock and Rusty testified that Rusty=s statement referred to injection of one of the Hoff
wells.  The Hoff well was not injected
until August 2001. 








Additionally, although
Masters did testify that the D.D. Strange had reached its primary production
limit in 1996, he also attributed the dramatic increase in production after
Brock & Strange took over to the fact that it was again being continuously
pumped.  Masters further testified that
while any injection on the O=Keefe benefitted the Hoff and Powell leases, it did not benefit the
D.D. Strange.  In other words, while the
rest of the reservoir had benefitted from the O=Keefe injection, the D.D. Strange did not because it was not being
pumped.[24]








Finally, Rusty=s own testimony regarding his reasons for decreasing production is at
odds with appellant=s theory
that Rusty genuinely believed that an injection would increase production on
the D.D. Strange.  Although the D.D.
Strange produced only 7 barrels in December 1998 and 6 barrels in January 1999Cwhen prices were hovering around $9 a barrelCbetween October 2000 and February 2001, when it was producing only one
barrel each month, oil prices were higher than they had been since at least
1991.  And Rusty admitted that appellant
and Doug did not cut back production on the Powell and Hoff during the same
time.  Finally, Rusty said that after
Brock told him in October 2000 that oil was coming out of the well casingheads
on the D.D. Strange, he produced the wells, but they would pump only one barrel
per day.  The evidence of the D.D.
Strange=s actual production contradicts this, however; it shows that between
October 2000 and February 2001, the last months appellant operated the lease,
it produced only 1 barrel per month. 
Thus, all of appellant=s attempted explanations for the lack of production on the D.D.
Strange are, at best, inconsistent, and the jury was entitled to disbelieve
them.  See Wilson, 168 S.W.3d at
827.








Moreover, the surrounding
circumstances also support an inference that Rusty knew the statement was
false, or was at least reckless in making it. 
When Brock started investigating what was going on, Rusty sold his interest
in the D.D. Strange to a third party, Willowbend, in which his son William was
a partner.  Rusty did not keep any
records regarding the D.D. Strange.  In
addition, evidence of other irregularities on the leases operated by appellantCfor example, the use of electricity from the O=Keefe deep well owners and the use of the O=Keefe No. 3 well as the injection well even though the No. 4 was
listed on the permitCcombined
with the fact that appellant is operated by family members of the surrounding
lease owners (and by persons who also own interests in the surrounding leases),
supports the conclusion that Rusty=s statement to Brock that he was waiting on the water to hit was
intentionally or recklessly false.

We conclude and hold that
there is both legally and factually sufficient evidence to prove that Rusty=s statement to Brock was false and that it was made intentionally or
with reckless disregard for the truth.

Analysis - Reliance

Appellant also contends that
the evidence is legally and factually insufficient to prove reliance because
Rusty made his statement to Brock, not appellee.  In addition, appellant contends that appellee
could not have relied on Rusty=s misrepresentation to her detriment because Brock continued to
investigate the reason for low production on the leases.

Texas does not require
privity to establish fraud.  Ernst
& Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 578, 580
(Tex. 2001) (AOur fraud
jurisprudence has traditionally focused not on whether a misrepresentation is
directly transmitted to a known person alleged to be in privity with the
fraudfeasor, but on whether the misrepresentation was intended to reach a third
person and induce reliance.@).  To prove that an alleged
fraudfeasor had reason to expect reliance,








[t]he maker of the
misrepresentation must have information that would lead a reasonable man to
conclude that there is an especial likelihood that it will reach those persons
and will influence their conduct.  There
must be something in the situation known to the maker that would lead a
reasonable man to govern his conduct on the assumption that this will
occur.  If he has the information, the
maker is subject to liability under the rule stated here.

Id. at 581
(quoting Restatement (Second) of Torts
' 531 cmt. d (1977)).

Here, the parties had been
doing business together for thirty to forty years.  Appellant operated numerous wells in a small
area in which appellee, Brock, and Rusty all held working interests.  Brock and Rusty were friends, and Rusty and
appellee=s husband had worked on twenty to twenty-five wells together.  After Strange passed away, Rusty had some
business dealings with appellee regarding the leases.  He dealt regularly with Brock regarding
operational details of the leases. 
Moreover, when asked at trial why he shut in the D.D. Strange, Rusty
testified, Athat=s all I could do because they was complaining about the costs.@  [Emphasis added.]  Thus, the evidence shows that Rusty would
have known that the information he told Brock would reach appellee for the
purpose of influencing her conduct.








As to whether appellee relied
on Rusty=s misrepresentation to her detriment, Brock testified that he had a
conversation with Rusty about why the D.D. Strange wells were shut in; he did
not say when that conversation occurred. 
Brock did not start investigating the D.D. Strange until after he began
investigating the O=Keefe in
2000.  Brock also testified that when he
had questioned Rusty about the expenses being charged for operating the D.D.
Strange while it was shut in, he just accepted Rusty=s answer.  Brock had trusted
Rusty.  

Appellant contends that the
evidence shows that Brock continued investigating the D.D. Strange issues after
Rusty told him he was waiting on the water to hit; thus, there is no evidence
that appellee could have relied on Rusty=s statement to her detriment. 
But it is a reasonable inference from Brock=s testimony that he and Rusty had the conversation about the water before
Brock started investigating the D.D. Strange and that Brock and appellee relied
on Rusty=s statement for at least some time. 
Brock testified that he did not even begin investigating the D.D.
Strange until after he had found irregularities on the O=Keefe.  Thus, we conclude and
hold that the evidence is legally and factually sufficient to prove appellee=s reliance on Rusty=s material misrepresentation.

For the same reasons, we also
conclude and hold that the evidence is legally and factually sufficient under
the clear and convincing standard of review to prove that appellee was harmed
by appellant=s
fraud.  See Hall, 168 S.W.3d at
170.








                                       Willful
Commingling

In its first
issue, appellant contends that the evidence is legally and factually
insufficient to support the jury=s finding that it willfully commingled oil that was produced from the
D.D. Strange with oil from the Powell and Hoff. 
As part of this issue, appellant contends that Texas Railroad Commission
reports purportedly relied on by appellee are not evidence of commingling, that
there is insufficient evidence of any commingling between the D.D. Strange and
the Powell, that there is insufficient evidence that if any commingling
occurred, it happened while appellant operated the D.D. Strange, that there is
insufficient evidence to identify oil that appeared in the Hoff saltwater
disposal tank after Willowbend took over operation of the D.D. Strange as
actually coming from the D.D. Strange, that there is insufficient evidence of
willfulness, and that the evidence shows, at most, only an accidental
malfunction of the separator float, the means by which appellee claims the oil
from the D.D. Strange was commingled with oil from the Powell and Hoff.

Applicable
Law








Commingling
is also referred to as confusion of goods; A[a]s a general rule, the confusion of goods theory attaches only when
the commingled goods of different parties are so confused that the property of
each cannot be distinguished.@  Humble Oil & Ref. Co.
v. West, 508 S.W.2d 812, 818 (Tex. 1974); see also 12 Tex. Jur. 3d Confusion of Goods
902, 903 (2004).  AOne who wrongfully permits the property of another to become so
intermingled and confused with his own property as to render it impossible to
identify the goods of each is under the burden of disclosing such facts as will
insure a fair division, and if he fails or refuses to do so, the combined
property or its value will be awarded to the injured party.@  12 Tex. Jur. 3d Confusion of Goods 902, 905-06 (2004)
(citing Humble Oil, 508 S.W.2d at 818); see Farrow v. Farrow, 238
S.W.2d 255, 257 (Tex. Civ. App.CAustin 1951, no writ).  In
applying the commingling rule, we hold one who willfully commingles to a strict
burden; however, the application of such a burden is not appropriate until Athe facts establish that there has been a commingling.@  Mooers v. Richardson
Petroleum Co., 146 Tex. 174, 204 S.W.2d 606, 608 (Tex. 1947); Cole v.
Wadsworth, 326 S.W.2d 928, 931 (Tex. Civ. App.CEastland 1959, writ ref=d n.r.e.); see also Dorchester Gas Producing Co. v. Harlow Corp.,
743 S.W.2d 243, 256 (Tex. App.CAmarillo 1987, writ dism=d).

Applicable Facts








Appellee alleged two theories
of commingling by appellant:  first, that
appellant had misreported production from the D.D. Strange to the Texas
Railroad Commission; and second, that appellant intentionally mis-set or
altered the setting of the float in the oil and water separator from the No. 2
well so that oil and water produced from that well crossed lease lines and
commingled with oil produced from the Powell and Hoff.  As damages, appellee pled for her Apro rata share of all oil produced from@ the Powell and Hoff.  The trial
court granted appellant=s directed
verdict as to the misreporting to the Railroad Commission, and appellee does
not challenge that decision on appeal. 
Thus, we will review whether the evidence is sufficient to support a
finding of willful commingling based on the separator setting.  

Appellee testified that when
she first went to inspect the D.D. Strange with Brock, she noticed that the
screw that would have held the separator Alever@ properly
was not there.  According to appellee,
this inspection occurred sometime between March and May 2001 when Willowbend
was operating the lease.  She could not
say whether the screw had been there when appellant was operating the lease.








According to Rusty, his son
Doug, who owned a working interest in the Hoff, agreed in 1998 or 1999 to
dispose of water pumped out of the D.D. Strange and Powell in the No. 1 well on
the Hoff.  Rusty also testified about the
operation of a separator.  According to
Rusty, there is a float inside that floats in oil but not water.  He agreed that the float is set on the line
where the oil and water meet (the oil will float on the water because it is
lighter).  The separator also has a dump
valve at the bottom; when the fluid gets to a certain level, the Afloat will go down and will dump out your saltwater out of the bottom.@  But if the float was sitting
on the bottom of the separator, both oil and water would flow out.  Rusty agreed that there was a similar
separator on the Powell and that there would be no legitimate reason to set the
float so that it would sit at the bottom of the D.D. Strange or Powell
separators.  Rusty agreed that his son,
Robert, who oversaw daily operations on the D.D. Strange, would know how to set
the float.[25]

Rusty testified that until
1999, appellant trucked the disposed water off of the D.D. Strange.  After Doug started disposing of the D.D.
Strange=s water on the Hoff, Rusty was not sure whether the water line from
the D.D. Strange went to the Powell water tank first and then to the Hoff or
whether the lines just Atied in
together.@  At some point, oil was found in the water
tank on the Hoff; Rusty said it was probably from the Powell because of the
decreased production on the D.D. Strange. 









Brock testified that after
appellant decreased production on the D.D. Strange, he began to Asuspect[] things . . . weren=t right on all the leases.@  One of the things he noticed
was that the separator was malfunctioning because Athe float wasn=t set on
it.  The setscrew wasn=t set on the float, and, therefore, it was on the bottom.@  The effect of the setting was
that if any fluid came throughCoil, water, or bothCit would all go down into the waterline.  According to Brock, the waterline from the
D.D. Strange went to either the Hoff injection well or the Hoff water tank.  Although Brock said that it was Apossible they could separate [the water from the D.D. Strange] again
over there on the Hoff lease,@ he also said that he had never told anyone that oil from the D.D.
Strange separator was going to the Hoff water tank.  Brock estimated that the separator was
repaired within about a week after Willowbend took over the D.D. Strange
operations, which was March 1, 2001. 

Brock testified that there was
no pin missing from the separator but that the setscrew was Aall the way out.@  When asked whether he was aware of any
evidence that the separator was not working perfectly when appellant was
operating the D.D. Strange, Brock answered, ANot that I know of, no.@








Brock testified that sometime
before Brock & Strange started pumping the No. 2 well, he could hear fluid
going through the flow line that went from the well tubing through the
separator to the tank battery, but there Awasn=t any gas or
fluid or anything going into the tank battery or even the separator.@  According to Brock, he
discovered a bypass buried underground that was causing fluid from the No. 2
well to go down the flow line for the No. 1 well instead of to the
separator.  Because the separator was set
at sixty pounds of pressure, the fluid couldn=t overcome that pressure and instead it was forced down the flow line
and through the bypass back into the casing for the No. 1 well.  Brock agreed on cross-examination that he
could not have run fluid into the storage tanks unless the separator was
working and that if the separator was not working, it would be impossible to
flow oil from the D.D. Strange into the tanks.

Although Brock seemed
confused during much of his testimony about the exact date that the bypass and
separator were discovered,[26]
he did testify clearly that the two problems were discovered about two or three
days apart.[27]  He also never wavered from his testimony that
the problem with the separator was discovered by Willowbend after it took over
operating the D.D. Strange in March 2001 and that Willowbend was the one who
showed him the separator problem.








Rusty=s son Doug testified by deposition. 
Doug operates the Hoff.  Doug
testified that before 2000, the water from the Strange was hauled off by tanker
trucks.  But in 2000, Doug agreed that
water from the D.D. Strange, Powell, Mullis, and maybe the Kinsey could be
pumped to the Hoff saltwater disposal tank, where he then disposed of the water
in one of the Hoff wells.  Doug admitted
that at one time, his son had found Aa couple or three feet@ of oil in the Hoff saltwater disposal tank.  He could not remember when this oil was
discovered, but he said, AThere
shouldn=t be oil down there.@  According to Doug, the oil was
from Murchison=s lease,
either the Powell, Mullis, or Kinsey;[28]
he did not know if Athe D.D.
Strange was going in there then or not.@  When the oil was discovered,
Doug told Murchison, AHey, you-all
got a problem over there.  You=re sending a trickle stream of oil down to our tank with your water.@ 

He further testified that the oil was struck by
lightning and burnt Aabout two
months ago.@[29] 








Robert, Rusty=s son and production supervisor for appellant=s operations, also testified at length about the operation of a
separator.  According to Robert, when the
fluid enters the separator, the water falls to the bottom and the oil rises to
the top.  A float is inside, which will float
on the water, but sink in the oil; thus, the float should always be on the
water line.  If there is no water in the
separator, the float will always stay on the bottom.  When the water rises to a certain level, a
handle on the float that is outside the separator activates a flip valve, which
opens a valve that allows the water to come out.  As the water level lowers, the float lowers
and the valve shuts off.  This way, the
separator is able to continuously release water from the separator as it comes
in.  There is another valve in the
separator that works strictly off of pressure. 
When oil builds up in the separator and the water has not reached the
level where it will be released, pressure builds up, which in turn opens a
different valve.  The pressure valve is
spring-loaded and Alets
pressure escape by a predetermined amount by the tension you put on the spring.@  Oil is released from that
valve and goes on to the tanks for storage. 

According to Robert, pressure
would not affect the separation of the oil and water except that there has to
be enough pressure to dispose of the water. 
The longer the distance the water needs to travel, the higher the
pressure needs to be in the separator.








Robert testified that he was
the person in charge of making sure the separator on the D.D. Strange worked
properly.  According to Robert, the
separator was functioning properly while appellant was operating the D.D. Strange.  He also testified that initially, water from
the lease went into a tank and was hauled off by truck.  He said that the haulers never discovered oil
in the water they collected, that they do not want oil in the water they collect,
and that they Awould know
right away@ if the
disposal water had oil in it.

Robert testified that A[i]n . . . 2000 or somewhere@ appellant stopped hauling water from the D.D. Strange and began
disposing of it on the Hoff.  The water
from the D.D. Strange, the Powell, the Kinsey, and the Mullis leases was
disposed of in one of the Hoff wells. 
All of the water lines from the leases met, in Robert=s words,

[u]p at the Powell tank
battery, which is where the water tank was when we were trucking the
water.  We sat the water tank at the
Powell because the other leases are down in a creek bottom.  To make sure we could always get a truck in
there to haul them, we set it at the Powell. 
And when we plumbed it in to go to the Hoff lease, everything was
already B all the wells were already coming to that point, so we just
disconnected the tank and tied them all together and laid the line from there
to the Hoff injection well.








In other words, before 2000 or so, all the water
from the Powell, Kinsey, and D.D. Strange went into the Powell water tank; the
Mullis lease had another tank at its location. 
On cross-examination, Robert testified that A[t]he water from the D. D. Strange went up to the oil-saltwater
on the Powell and then went to the Hoff in 2000.@  [Emphasis added.]  Thus, Robert agreed that from 2000 on,
anything dumped out of the separator on the D.D. Strange would go to the Powell
and then over to the Hoff.  Robert
further testified that if oil got into the water line, you would not be able to
tell which lease it came from; you would have to check each lease=s separator.

Robert testified on
cross-examination that it was possible to set the float in such a way that the
dump valve would always be open, then Awater, oil, pressure, everything@ would go out the dump valve and Astraight into the water line,@ as if there were a hole in the separator.

Keith Masters, appellee=s expert, testified that his calculation of commingling damages was
based on above-ground mixing of the oil from the Powell, Hoff, and D.D.
Strange.  In other words, his damage
calculation was based on the theory that oil actually produced from the D.D.
Strange mixed with oil that was actually produced from both the Powell and the
Hoff so that one could no longer tell which percentage of oil was produced from
which lease.








Peyton Carnes, appellant=s expert, also testified about the operation of a separator.  There is a dump valve where the water goes
out and a line where the oil goes out to the tank.  The float has a rod attached to it, and the
rod is attached to the dump valve on the bottom of the separator.  The float should be set so that it floats on
the line where the oil and water meet. 
As the water level rises, the float rises, the rod lowers, and the dump
valve opens.  As the water level lowers,
the float lowers, and the dump valve closes. 
So if the rod is properly affixed to the float and dump valve, when the
float is at the bottom of the separator, the dump valve is closed rather than
open.

On cross-examination, Carnes
agreed with appellee=s counsel
that if the separator is working correctly, Ait is virtually impossible to send oil down the water valve.@  To the question, A[I]f somebody is out there monkeying with this thing and has set it
incorrectly, then you would have a situation where your water and your oil were
going out the bottom of it, correct?@, Carnes answered, AThat=s possible.@ 








In closing argument, appellee=s counsel urged the jury that the evidence of commingling came from
the following:  the separator setting and
Athe oil and the water from the Strange going to the Powell and the
Hoff. . . .  Doug Lindemann admits that
there was a stream of oil coming from the Strange to the Powell and the Hoff.@  The jury charge asked, ADid the operator of the Strange Lease willfully commingle the oil
production from the D.D. Strange, Powell, and Hoff?@ to which the jury answered, AYes.@  On appeal, appellee=s support for its commingling claim is the evidence of overproduction
of the HoffCas discussed
in detail, supra, in our discussion of appellant=s second issue on fraudCthe separator setting, and the presence of oil in the Hoff saltwater
tank. 

Analysis

Appellee=s evidence of overproduction of the Hoff, standing alone, is not
sufficient to prove commingling.  In
light of appellee=s evidence
of underground drainage, which supports its fraud claim, overproduction of the
Hoff could have been caused solely by the improper drainage.  Thus, we must consider whether the
overproduction evidence, taken together with the evidence regarding the
separator setting, establishes willful commingling.








Appellee contends that the
presence of oil in the Hoff saltwater tank shows commingling.  But there is no evidence that the tank to
which the D.D. Strange water (and oil, assuming the separator was mis-set) was
pumped was a separator in which oil produced from the Hoff mingled with oil and
water from the D.D. Strange and Powell; instead, all the evidence is that after
2000, the water from the D.D. Strange and Powell went to the Hoff water
disposal tank, which then went back into the Hoff injection well.  Because the waterlines from the D.D. Strange
and Powell Atied in
together@ and then went to the Hoff, any fluid from the D.D. Strange and
Powell, while perhaps mixed together in the connected waterline, would
ultimately end up in the Hoff injection well. 
There is no evidence that any of this fluid was actually Aproduced@ and
diverted to the Hoff storage tanks. 
Indeed, the conclusion that the water tank on the Hoff was a disposal
tank only and not a separator is supported by Doug=s testimony that there should not have been oil in that tank.  One would expect oil to be in a separator but
not a water disposal tank.

Thus, we are left with the
evidence regarding the setting of the separator.  There is evidence that before 2000, any fluid
coming down the waterline from the D.D. Strange went, in Robert=s words, to the Aoil-saltwater@ on the Powell.  It is a
reasonable inference from this testimony that fluid traveling down the
waterline from the D.D. Strange, whether oil, water, or both, did not go merely
to a disposal tank but to a separator, and that if any oil was in the D.D.
Strange waterline, it was produced, and thus commingled, with the oil produced
from the Powell.  But Willowbend, Brock,
and appellee discovered the separator mis-setting in spring 2001, after water
was already being sent to the Hoff. 
There is no evidence as to how long the separator had been mis-set,
whether the mis-setting was intentional, as appellee contends, or accidental,
as appellant contends.[30]








If the jury believed Brock=s testimony that the bypass was discovered before the separator and
that when the bypass was discovered, no oil could have even made it to the
separator because it was all going back into the No. 1 well, then the fact that
the separator was set so that its dump valve was continuously open would not
matter because fluid would never reach the separator in the first place.  To interpret Brock=s testimony otherwise, that is, interpret it to mean that the
separator mis-setting was discovered first, then the jury would have had to
disbelieve his testimony about the bypass (because, again, even if the
separator mis-setting was discovered first, if the bypass was functional as
Brock said, no oil would have even made it to the separator).








Additionally, everyone agreed
that if the float had been set so that the dump valve was continuously open,
all oil would have gone down the waterline and none would have made it to the
D.D. Strange tank battery for storage. 
Thus, the jury would have had to believe that either the production
records for the D.D. Strange had been falsified (and the trial court=s directed verdict on that issue has not been challenged) or that
appellant hooked up the separator properly to pump one barrel per month into
the D.D. Strange tank battery (or, for several years before October 2000,
approximately one barrel per week), then intentionally mis-set the separator
after pumping so that it could pump additional fluid through the separator and
over to the Powell.  This conclusion would
require too much speculation on the jury=s part; there is no evidence that such continual alteration of the
separator setting occurred.

Accordingly, we conclude and
hold that the evidence is legally insufficient to sustain the jury=s finding of wrongful commingling. 
We sustain appellant=s first issue.  In addition,
because appellant also challenged the damages awarded as to commingling, we
sustain its third issue challenging the damages awarded by the jury for
wrongful commingling.

                                              Damages

In its
fourth and fifth issues, appellant challenges the legal and factual sufficiency
of the actual and exemplary damages awarded to appellee on her fraud claims.

Appellant challenges the damages
not only on the ground that the jury=s fraud finding was not supported by the evidence; it also challenges
the evidence supporting the amount of damages awarded by the jury on the
grounds that the expert who calculated the damage model did not testify that
any fraud had occurred and that there is no evidence that Rusty=s statement caused any particular harm to appellee.








Although, as appellant points
out, MastersCappellee=s expert who calculated damages based on the improper drainage of the
D.D. Strange oilCdid not
testify that his damage calculations were based on a determination that fraud
had occurred, there is other evidence in the record supporting the conclusion
that appellant committed fraud.  And
appellee=s theory at trial was that Rusty made his false statement about the
decrease in D.D. Strange production to facilitate the continued improper
drainage; i.e., he did not want appellee and Brock to investigate further so
that appellant (and his sons) could continue draining the reservoir without
interference.  Thus, the fact that
Masters himself did not calculate the damages based on a conclusion of fraud is
immaterial.








The jury has the discretion
to award damages within the range of evidence presented at trial, so long as a
rational basis exists for the jury=s calculation.  Duggan v.
Marshall, 7 S.W.3d 888, 893 (Tex. App.CHouston [1st Dist.] 1999, no pet.); Mayberry v. Tex. Dep=t of Agric., 948 S.W.2d 312, 317 (Tex.
App.CAustin 1997, writ denied). 
Here, the jury=s award of
$233,300 corresponds closely with Masters=s damage calculations for drainage of the D.D. Strange oil from 1995
through February 2001.  Although the
evidence regarding the well being Ashut in,@ i.e., not
being productively pumped, tends to show that the shutting in did not occur
until 1998 at the earliest, there is also evidence, via Rusty=s deposition testimony, with which he was impeached, that appellant actually
began cutting back on production in 1995. 
And as we have already determined, there is legally and factually
sufficient evidence that appellee=s reliance on Rusty=s statement on waiting for the water to hit facilitated appellant=s drainage of the oil under the D.D. Strange.  Accordingly, we conclude and hold that the
jury=s damage award is supported by sufficient evidence.  We overrule appellant=s fourth issue.

Appellant challenged the
$200,000 exemplary damages awarded by the jury solely on the ground that there
is no clear and convincing evidence that appellee was harmed by the fraud.  We have already determined that the evidence
supports such a conclusion; thus, we overrule appellant=s fifth issue.

                                             Conclusion

Having overruled appellant=s second, fourth, and fifth issues, we affirm the trial court=s judgment as to the jury=s findings on fraud and the actual and exemplary damages related to
that claim.  But having sustained
appellant=s first and
third issues, we reverse the part of the judgment awarding appellee damages for
willful commingling and render a take-nothing judgment as to that claim only.

 

TERRIE LIVINGSTON

JUSTICE

 

 

PANEL A:   CAYCE,
C.J.; LIVINGSTON and MCCOY, JJ.

DELIVERED: May 29, 2008











 
 
 
 
 




 











[1]He also
gave a 1/16th working interest to Brock. 
Appellee=s
counsel clarified with appellee that when the parties referred to a Aworking
interest,@ Athat
means you pay part of the expenses and you get part of the proceeds.@  And when they referred to a royalty interest,
Athat
means you own the minerals under the land and you=ve
leased those minerals and you get a part of the proceeds but you don=t
have to pay the day-to-day working expenses like insurance and overhead and
electricity and fuel and repair parts.@





[2]Rusty
testified at trial that he formed appellant in 1994 and that appellant took
over operations of his leases.





[3]Appellee
and Brock each own a 1/16th working interest in the Powell.





[4]Rusty
also operated the Kinsey lease west of the D.D. Strange and the Mullis lease
north of the Powell.  A map showing the
location of the various leases is appended to this opinion as Attachment AA@.





[5]Appellee
explained that Ano
oil was being run out from under [her] lease.@





[6]Brock
testified that he checked the O=Keefe first and that the
irregularities he found there made him suspicious about the D.D. Strange.  For instance, he found new tong dyes
(equipment used on the oil wells) in one of the O=Keefe
well casingheads that should not have been there.  In addition, the O=Keefe
was producing oil, but Brock & Strange had not been getting any money from
production.  When he confronted Rusty
about this, Rusty told him the oil had been Amisplaced@ and
that it had been run on a different lease Rusty owned; Rusty paid Brock &
Strange for the Amisplaced@
oil.  Brock & Strange took over
operating the O=Keefe
in the latter part of 2001.





[7]There
is conflicting evidence as to whether the wells were Ashut
in,@ that
is, not producing in paying quantities, or whether they were simply pumped only
long enough to produce the minimum amount of paying quantity per month.  Nevertheless, it is clear that production
from the D.D. Strange decreased significantly between 1998 and the early part
of 2001.





[8]A
separator is a device that separates the oil and water pumped from a well.





[9]These
terms are used interchangeably in the record.





[10]Appellee
testified that she purchased Murchison=s interest but then assigned
him half of what he had conveyed to her. 
It is unclear who owned all the working interests in the D.D. Strange,
and in what amount, after the transfer.





[11]These
damages are the total amount calculated by appellee=s
expert from May 1991 through February 2001.





[12]Appellee
has not appealed the judgment in Rusty=s favor.





[13]The
jury awarded appellee the entire amount of damages that her expert attributed
to wrongful drainage during the time period from May 1991 through February
2001; however, because the jury also found that only appellant, not Rusty
individually, had substantially drained the D.D. Strange, appellee was entitled
to recover damages only from July 1, 1994 through February 2001.  After the damages attributable to the time period
before appellant operated the D.D. Strange are subtracted, appellee=s
recovery on the drainage claims would be only $282,463.93. 





[14]Appellant
also brings two contingent issues, challenging the jury=s
findings on wrongful drainage and attorney=s fees in the event appellee
attempts to challenge the trial court=s ruling as to those
findings.  Appellee responds to the
contingent issues, contending that the jury=s findings as to wrongful
drainage and attorneys= fees
were proper.  However, we do not address
these issues because appellee did not file a separate notice of appeal
challenging the trial court=s decision to disregard these
findings.  See Tex. R. App. P. 25.1(c); Wagner
& Brown, Ltd. v. Horwood, 58 S.W.3d 732, 737 (Tex. 2001); Pettus v.
Pettus, 237 S.W.3d 405, 421-22 (Tex. App.CFort
Worth 2007, pet. denied).





[15]The
evidence regarding the bypass hose and separator is discussed at length in the
following discussion of appellee=s first issue regarding
willful commingling.





[16]The
lease produced 30 barrels the first month Brock & Strange took over
operations.





[17]The
operator controls production on and makes day-to-day decisions regarding the
lease.





[18]The
evidence shows that oil prices were around $9-$11 a barrel from December 1998
through January 1999.  Appellant
introduced into evidence a letter from Brock & Strange written around this
time stating that due to the decline in oil prices, Brock & Strange were
going to pump another of its leases, the Strange Fee AB@
lease, only once per week.





[19]Acidizing
is a technique to increase oil production. 
It consists of pumping acid into the well, which cleans out the well and
the underlying formation.





[20]There
is some confusion in the record as to whether the well on the Hoff was an
injection well or merely a disposal well. 
Rusty testified that an injection well puts more water into the
underlying formation than it takes out, but a disposal well simply disposes of
the same amount of water that the wells produce along with any oil.  The purpose of an injection well is to
increase production from a formation once it has already produced all the oil
that it will produce naturally; it is a secondary recovery technique, in the
same vein as acidization.





[21]There
were two levels of mineral interests on the O=Keefe:  interests in the shallow formation and
interests in the deeper part of the formation. 
Rusty owned the shallow interests and part of the deep interests, along
with Brock & Strange, among others.





[22]Appellee=s
expert Keith Masters calculated the original oil in place under the reservoir
and how much of that was attributable to each lease, then calculated how much
of the original oil in place was produced from each lease.  He then determined how much each lease
actually produced.  For example, while he
determined that the Hoff had 16.4% of the original oil in place in the
reservoir, it actually produced 88.4% of the oil, or 56.9% of the reservoir,
while the D.D. Strange, which had 8.5% of the original oil in place, produced
7.3% of the original oil in place or only 2.4% of the reservoir.  Masters testified that the Hoff could not
have produced that much of the original oil in place in the reservoir absent a
drainage.  He also attributed the
increase in production of the D.D. Strange when Brock & Strange took over
to its being continuously produced.





[23]Rusty
had testified earlier that he had planned to do a waterflood someday.





[24]Appellant
attempts to attribute the dramatic increase in production on the D.D. Strange
after Brock & Strange took over solely to the acidization performed in July
2001.  But in May 2001, Willowbend pumped
13 barrels, and in June 2001, the first month Brock & Strange operated the
lease, it produced 30 barrels.





[25]Robert
owns working interests in the Powell and Hoff but not the D.D. Strange.





[26]Brock
admitted that he had guessed at Aa lot of dates.@





[27]Brock=s
testimony is quite conflicting as to when the bypass and separator were
discovered.  Although he testified
several times that he found the bypass after Brock & Strange took over
operations, he also testified that he found the separator malfunction after finding
the bypass and was adamant that the separator malfunction was discovered by
Willowbend while it was operating the lease. 
However, at one point Brock also testified that he found the bypass with
Brock & Strange=s
pumper, Kinsey, before Brock & Strange took over operation of the lease;
this testimony could have been relied upon by the jury to resolve the conflict
with his other testimony.  See Wilson,
168 S.W.3d at 827.





[28]There
is no evidence of the exact date of this discovery, but it must have been after
March 2001 when Willowbend took over operations on appellant=s
former leases.





[29]There
is no date for the deposition in the record, but because there is no indication
that there was any presuit discovery, see Tex. R. Civ. P. 202, we presume that the deposition was taken
after suit was filed.





[30]The
evidence of the separator mis-setting is also consistent with the lease having
been shut in completely for several months; Brock testified that when he first
went to the D.D. Strange, it looked as if no one had been out there for awhile.